IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,911

STATE OF KANSAS,
*Appellee*,

v.

WILLIAM BARBER, JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 60-404 requires that an objection to evidence be timely interposed and stated in a manner that makes clear the specific ground of objection. A party satisfies this requirement by making a timely trial objection that incorporates pretrial arguments, even if the party does not repeat those arguments, as long as the pretrial arguments were sufficiently specific to inform the trial court of the basis for the trial objection.

2.

A defendant who appeals admission of a certain witness' testimony about the defendant's other crimes or civil wrongs under K.S.A. 2010 Supp. 60-455 without challenging the same or similar testimony admitted through other witnesses that is as prejudicial or more prejudicial than the contested testimony is not entitled to reversal; any error arising out of admission of the contested testimony is harmless.

3.

The jury in this case is presumed to have followed the version of PIK Crim. 3d 52.06 given by the trial court. The instruction, as modified at the request of the defense, adequately informed the jury of the limited purposes for which evidence of other crimes

or civil wrongs could be considered and was not clearly erroneous by virtue of being overbroad.

4.

Appellate review of allegations of prosecutorial misconduct, including misconduct occurring during closing arguments, which need not be preserved by a contemporaneous objection, requires a two-step process. First, an appellate court determines whether there was misconduct, *i.e.*, whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. In analyzing the second step of whether the defendant was denied a fair trial, an appellate court considers three factors: (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. No one factor is controlling.

5.

A prosecutor has wide latitude to craft arguments that include reasonable inferences to be drawn from the evidence.

6.

A prosecutor may not make statements intended to inflame the jury's passions or prejudices or attempt to distract the jury from its duty to rely on the evidence to decide the case.

7.

A prosecutor may not offer a personal opinion on the credibility of a witness because the statement amounts to unsworn and unchecked testimony. But when the evidence presents the jury with two conflicting stories, the prosecutor can argue why one version is not believable.

8.

A prosecutor may not comment on facts not in evidence.

9.

A prosecutor may use rhetorical devices to bring the evidence in a case into a meaningful context.

10.

Issues regarding a trial court's compliance with the procedures set out in K.S.A. 22-3421 for inquiring about a jury's verdict in a criminal trial may not be raised for the first time on appeal.

11.

Cumulative error occurs when the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. But no prejudicial error may be found under this rule if the evidence against the defendant is overwhelming.

12.

A trial court does not violate a defendant's constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), by using prior convictions in calculating the defendant's criminal history score to enhance a sentence

3

without requiring the criminal history score to be included in the complaint and proven to a jury beyond a reasonable doubt.

Review of the judgment of the Court of Appeals in an unpublished opinion filed March 29, 2013. Appeal from Cherokee District Court; OLIVER KENT LYNCH, judge. Opinion filed July 10, 2015. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Michelle A. Davis,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Natalie A. Chalmers*, assistant solicitor general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

*Per Curiam*:  Two-month old Autumn Barber suddenly developed life-threatening seizures and respiratory distress while at home in the sole care of her father, William Barber, Jr. Autumn's treating and examining physicians found recent traumatic injuries that were highly indicative of shaken baby syndrome. The State charged Barber with aggravated battery and child abuse, and a jury convicted Barber on both counts. On appeal to the Court of Appeals, Barber raised several issues.

The Court of Appeals panel affirmed Barber's convictions and sentences. *State v. Barber*, No. 106,911, 2013 WL 1339884 (Kan. App. 2013). The panel concluded:  (1) The trial court properly admitted testimony under K.S.A. 2010 Supp. 60-455 of prior instances where Barber had shaken Autumn; (2) the trial court did not err in giving a jury instruction that limited the jury's consideration of evidence admitted under K.S.A. 2010 Supp. 60-455; (3) the prosecutor committed misconduct during her closing arguments but

the error did not affect the jury's verdict; (4) Barber failed to preserve his claim that the trial court improperly accepted the jury's verdict under K.S.A. 22-3421; (5) there was no cumulative error in this case; and (6) Barber's criminal history score did not need to be proven to a jury in order for it to affect his sentence. 2013 WL 1339884, at *2-10.

We agree and affirm Barber's convictions and sentences.

FACTS AND PROCEDURAL HISTORY

On February 7, 2008, a Cherokee County Sheriff's Office dispatcher received a 911 call for medical assistance from Barber, who reported, "My daughter, she's two months old, she's having a seizure, she's not breathing on me." When emergency services arrived, Barber explained he was home alone with Autumn, who had been sleeping in her "bouncy seat" when she suddenly screamed. He picked her up, and she became limp and began seizing. When the paramedic asked Barber about Autumn's medical history, Barber said that the seizures began suddenly and might be related to some routine shots from a couple of days earlier.

Once Autumn was at the hospital, a CAT scan revealed a subdural hematoma and bleeding around the brain. The emergency room physician concluded a traumatic injury damaged Autumn's brain and caused her seizures. The physician met with Barber and his wife, Karen Barber, and without mentioning his exam results or his conclusions, asked if anything traumatic had happened to Autumn. Barber volunteered that he had never shaken her. After the conversation, the physician checked Autumn's eyes and found retinal hemorrhages. According to the physician's testimony at trial, retinal hemorrhages are most likely the result of shaken baby syndrome due to "the amount of pressure and force it requires to rupture those blood vessels in the retina."

5

Autumn's life-threatening injuries necessitated transporting her by helicopter to Children's Mercy Hospital in Kansas City, where multiple physicians in varying specialties examined her. Several of these physicians testified at trial that Autumn exhibited significant, multilayered hemorrhages in both eyes, there was blood throughout her brain, and her brain tissue was swollen. These physicians opined that Autumn suffered from inflicted trauma consistent with shaken baby syndrome and that she would have begun exhibiting symptoms immediately after the injury.

Evidence was admitted at trial of Barber's interviews with law enforcement officers. According to the police reports, Barber told officers he quit his job on the morning of February 7, 2008, after being asked to shovel manure. Karen left soon after he arrived home around 11 a.m. (According to other witnesses' testimony, Barber had told a physician he arrived home around 10:30, and his employer said that he left work at 9:30.) Barber and Karen both testified that Autumn was sleeping when Karen left. According to Barber, shortly after Karen left, Autumn woke up screaming. She then went stiff and stopped breathing. When investigators asked Barber how he generally handled Autumn's crying, Barber replied that Karen handled it—he did not pick Autumn up when she cried because he was afraid he would not be able to get her to stop.

Despite his claim that he did not handle Autumn when she cried, several trial witnesses testified about occasions when Barber did care for Autumn when she was crying. In addition, two eyewitnesses—Jolene Brown (Karen's sister-in-law) and Melissa Conner—testified at trial that Barber had previously shaken Autumn. An investigating officer recounted to the jury these witnesses' statements made during the investigation into the cause of Autumn's injuries; both statements included information about prior incidents of shaking.

More specifically, the investigating officer testified that Brown reported an incident when she was alone with Barber and Autumn. Brown told the officer she had seen Barber shake Autumn "back and forth trying to get her to quit crying. . . . [I]t wasn't a violent shaking. It wasn't anything that, you know, was a concern that it would cause any injury at that time but she could feel the frustration. And because of the frustration she became concerned." He also testified Brown had reported that Barber kept telling Autumn to "[j]ust shut up, will you just shut up." She recalled that the incident occurred sometime during the week before Autumn's hospitalization.

In Brown's trial testimony, she explained that Barber "was not really shaking her violently but he was kind of moving her in a way that I—it didn't raise concern to where I thought that I should do something right that second." Nevertheless, she spoke to her in-laws and suggested they "let him know that he can't be rough with the child or that he shouldn't move her that way."

The other eyewitness, Conner, testified that she spoke to Karen at least three times about her concern that Barber needed to be more careful in handling Autumn. Approximately a week or 2 before Autumn's hospitalization, she gave Karen a pamphlet on shaken baby syndrome. Conner testified she saw Barber throw Autumn in the air in play, and, on one occasion, she saw him shake the baby when he was frustrated. The investigating officer testified that Conner had reported she "quit hanging around over there [at Barber's home] in the last three to four weeks because she didn't like the way [Barber] was treating the baby." Conner had explained that Autumn was a "very fussy child" who "cries all the time, especially when [Barber] is around and especially when [Barber] has the baby." She had also indicated to the investigating officer that Barber became frustrated with the crying, and she had reported seeing him shake Autumn "four or five times."

7

The jury convicted Barber of aggravated battery under K.S.A. 21-3414(a)(1)(A) and child abuse under K.S.A. 21-3609. At sentencing, the trial court found Barber to have committed the aggravated battery with excessive brutality. Therefore, the court imposed an upward departure sentence of 128 months' imprisonment for aggravated battery and the standard 34-month sentence for child abuse, which the court ordered Barber to serve consecutively.

We will add additional facts as necessary to a discussion of each issue.

ANALYSIS

1. K.S.A. 2010 SUPP. 60-455

Barber argues the trial court committed error by admitting testimony regarding prior instances of him shaking or roughly handling Autumn. The State first contends this issue was not properly preserved.

*Preservation*

K.S.A. 60-404 provides:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

Barber did not object during Conner's testimony nor did he object when the investigating officer recounted the statements of both Brown and Conner. Perhaps because of this,

8

Barber's appellate brief raises an issue only about Brown's testimony, during which he did state an objection.

Despite Barber's objection to Brown's testimony, the State argues Barber did not preserve the issue for appeal because the trial objection was not "stated as to make clear the specific ground of objection." The State acknowledges that Barber did raise a specific objection to the evidence during the pretrial hearing; however, the State argues the pretrial objection cannot be seen as "timely interposed."

Before the jury, Barber's counsel objected without explanation and asked to be heard on the objection. The court recessed, at which point defense counsel did not present a legal argument to the court or cite a specific rule of evidence. Instead, defense counsel asked the court "to prohibit these types of examples based on our previous motions and rulings." The trial court overruled the objection.

In interpreting K.S.A 60-404's requirement that an objection be "timely interposed," this court has required a party to state a trial objection to evidence even if the trial court had issued a pretrial ruling on the matter. Barber's counsel did object at trial, giving the court time to reconsider the pretrial ruling.

The State argues, however, that to be timely interposed the trial objection on its own must meet the specificity requirement of K.S.A. 60-404. This court's prior decisions do not support the State's argument, however. We have explained that a trial objection must be as specific as necessary to allow the trial court to "consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error." *State v. Richmond*, 289 Kan. 419, 429, 212 P.3d 165 (2009). This purpose can be served by pretrial arguments presented to the trial court. See *State v. Inkelaar*, 293 Kan. 414, 421-22, 264 P.3d 81 (2011). In a case such as this, where the parties filed pretrial

motions and briefed and argued the evidentiary issue, the purpose of the specificity requirement can be satisfied. Barber's trial objection referred to the pretrial proceedings, indicating he was resting on the specific legal grounds he had stated before trial. This also signaled to the trial court—and to us—that he was not raising a different legal argument from those already considered by the trial court.

Hence, we conclude that Barber's trial objection to Brown's testimony—an objection that incorporated Barber's pretrial arguments regarding reasons the evidence should not be admitted—was sufficient to inform the trial court of the legal basis for the objection and to allow the trial court to reconsider the pretrial ruling after having heard the evidence unfold during the trial. Barber's objection, therefore, was sufficient under K.S.A. 60-404 to preserve his appellate arguments about the inadmissibility of Brown's testimony.

*Admissibility and harmlessness*

K.S.A. 2010 Supp. 60-455(a) provides that "evidence that a person committed a crime or civil wrong on a specified occasion[] is inadmissible to prove such person's disposition to commit crime[s] or civil wrong[s] as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." Such evidence is admissible, however, if relevant to some other material fact. *Inkelaar*, 293 Kan. at 423. K.S.A. 2010 Supp. 60-455(b) provides a nonexhaustive list of possible material facts that would justify the admission of other crimes evidence, including "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." See *State v. Gunby*, 282 Kan. 39, 56, 144 P.3d 647 (2006) (list of material facts in K.S.A. 60-455 exemplary rather than exclusive).

The trial court's pretrial ruling in favor of admission did not state which, if any, material fact listed in the statute or which other material fact was in question. The trial court also did not explain when overruling Barber's trial objection to Brown's testimony. But, later, when instructing the jury, the court said the evidence could "be considered solely for the purpose of proving the relationship of the parties and a continuing course of conduct."

Our decision in *Gunby*, 282 Kan. 39, Syl. ¶ 3, sets out the applicable test for admission of such evidence and corresponding standards of appellate review.

First, the trial court must determine whether the fact to be proven is material under K.S.A. 2010 Supp. 60-455(b). That is whether it relates to one of the material facts identified in that provision—motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident—or some other material fact other than propensity to commit crime. To be material the fact must have some real bearing on the decision in the case. An appellate court reviews this determination independently, without any required deference to the trial court. *Inkelaar*, 293 Kan. at 424.

Second, the trial court must determine whether the material fact is disputed. If so, the trial court must also determine whether the evidence is probative of the disputed material fact, that is, whether it has any tendency in reason to prove the fact. An appellate court reviews this determination for an abuse of discretion. 293 Kan. at 424.

Third, the trial court must determine whether the probative value of the evidence outweighs the potential for producing undue prejudice to the defendant. An appellate court's standard for reviewing this determination is also abuse of discretion. 293 Kan. at 424.

11

Ordinarily, we would now turn to a thorough analysis of the merits of Barber's argument that the trial court should not have admitted Brown's testimony, guided by the authorities recited above. On the record before us, however, even if we assume that the admission was erroneous under K.S.A. 60-455, we could not reverse on that basis. Other testimony, not challenged by Barber on appeal, was bound to inflict the same or greater damage than that inflicted by Brown's testimony on the defense case.

For starters, the investigating officer testified at trial about Brown's pretrial statement. He reported that Brown had seen Barber shake Autumn "back and forth trying to get her to quit crying" in the week before Autumn's hospitalization.

Even more damning, Conner told Barber's jury about having seen Barber handling Autumn too roughly, including shaking her "four or five times"; having warned Karen about this behavior repeatedly; and having given Karen a pamphlet on shaken baby syndrome. Conner testified that she was so uncomfortable with Barber's treatment of Autumn that she "quit hanging around."

Any error in admitting the testimony of Brown about Barber's prior crimes or civil wrongs was not reversible.

## 2. LIMITING INSTRUCTION NOT ERRONEOUS

After admitting the evidence under K.S.A. 60-455, the trial court provided a limiting instruction that stated:

"Evidence has been admitted tending to prove that the defendant committed bad acts other than the present crimes charged. This evidence may be considered solely for the purpose of proving the relationship of the parties and a continuing course of conduct."

12

Such a limiting instruction is required, even if prior crimes evidence has been properly admitted. See *Inkelaar*, 293 Kan. at 424 (if the presented evidence meets the test for admission under K.S.A. 2010 Supp. 60-455[a], "'then the trial court must give a limiting instruction "informing the jury of the specific purpose for [the evidence's] admission."'"); *Gunby*, 282 Kan. 39, Syl. ¶ 3 ("to avoid error, the district judge must give a limiting instruction informing the jury of the specific purpose for admission").

The instruction given in this case was patterned after PIK Crim. 3d 52.06, although the trial court made two adjustments. First, where the pattern instruction refers to prior crimes or civil wrongs, the trial court substituted the phrase "bad acts." Barber suggested this change, in an apparent attempt to soften the prejudicial impact of the evidence, which could have supported a battery or child abuse prosecution. The pattern instruction anticipated the second adjustment—the pattern instruction leaves a blank in which the trial court can fill in the basis for admitting the evidence. In this case, the trial court filled in the blank with the reasons deemed relevant in this case: relationship of the parties and continuing course of conduct.

*Standard of review*

When analyzing jury instruction issues, we (1) determine whether the issue can be reviewed, (2) determine whether any error occurred, and (3) finally determine whether any error requires reversal. See *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012); see also *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012) (explaining that "reviewability" must be considered from both jurisdiction and preservation standpoints).

The first and third steps are interrelated in that whether a party has preserved an issue for review will have an impact on the standard by which we determine whether an error is reversible. See *Williams*, 295 Kan. at 515-16. If a party preserves a jury instruction issue by raising an appropriate argument before the trial court, there are no reviewability problems: We will determine whether there was an error and, if so, ask whether it was "harmless." *Plummer*, 295 Kan. at 162; see *Williams*, 295 Kan. at 518; see also K.S.A. 60-261.

On the other hand, if, as in this case, a party fails to preserve an objection to the jury instructions by not raising the argument before the trial court, we will still review whether the instruction was legally and factually appropriate but will reverse only for "clear error." *Williams*, 295 Kan. at 510, 516. An instruction is clearly erroneous when "'the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013) (quoting *Williams*, 295 Kan. at 516); see *Williams*, 295 Kan. at 516 (explaining that the burden to show clear error remains on the party seeking reversal).

*Legal appropriateness*

Barber argues this limiting instruction was clearly erroneous because it was not limiting enough. He complains the instruction permitted the jury to convict him based on his propensity to commit the charged crimes. In essence, Barber attempts to reframe his entire admissibility argument under K.S.A. 60-455 as a legal challenge to the limiting instruction.

Barber's overbreadth challenge relates only to the legal appropriateness of the instruction—"an instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm." *Plummer*, 295 Kan. at

14

161. As noted above, the trial court used PIK Crim. 3d 52.06, which it modified at Barber's request to reference "bad acts" instead of "crimes." We strongly recommend the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions. See *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009).

Citing no authority, Barber then makes a conclusory contention that the PIK instruction permitted the jury to convict him based on a perceived propensity to commit aggravated battery and child abuse. We disagree. The instruction told the jury it could consider the evidence only for specified purposes not coextensive with prohibited propensity. We presume the jury followed the limiting instruction and did not convict Barber based only on its belief that he possessed a propensity to commit the charged crimes. See *Reid*, 286 Kan. 494, Syl. ¶ 18 ("A jury is presumed to follow the instruction given to it.").

Barber is not entitled to reversal on the basis of a clearly erroneous limiting instruction.

### 3. PROSECUTORIAL MISCONDUCT

Barber points to four portions of the prosecutor's closing argument in which he alleges she committed misconduct.

*Standard of review and analytical framework*

"Appellate review of allegations of prosecutorial misconduct, including misconduct occurring during closing arguments, which need not be preserved by a contemporaneous objection, requires a two-step process. First, an appellate court

15

determines whether there was misconduct, *i.e.*, whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. [Citations omitted].

"In analyzing the second step of whether the defendant was denied a fair trial, an appellate court considers three factors: '(1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors.' No one factor is controlling. [Citations omitted.]" *State v. Armstrong*, 299 Kan. 405, 416, 324 P.3d 1052 (2014).

The third factor can override the first two factors only if the State can prove "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Armstrong*, 299 Kan. at 417 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012]) (recognizing that while the State must prove harmlessness under both statutory and constitutional standards, the outcome turns on the constitutional standard because it is more rigorous). On appeal, Barber focuses on a number of statements in the prosecutor's closing argument.

*He thinks he's the victim*

First, Barber presents a challenge to the following statements:

"Assess [Barber's] credibility. *Have you not sort of gotten the impression that he thinks he's the victim here; that he's wrapped into his own victimhood*? Did he get –[Barber objects, objection overruled.] When you assess that, that temperature from him. You have

16

everything that he has said about this case and how it has grown and changed over time. At first they're pointing toward Missy Conner the baby-sitter. And then as this developed is it back toward Karen Barber or now is the smoking gun, weapon, the bouncy seat chair somehow. No. *And overall he still feels sorry for himself*. I wasn't going to do stuff that I wasn't supposed to do about how I lost my job." (Emphasis added.)

To be sure, "[a] prosecutor has wide latitude to craft arguments that include reasonable inferences to be drawn from the evidence." *State v. Bennington*, 293 Kan. 503, 531, 264 P.3d 440 (2011). Here, it appears the prosecutor urged the jury to see Barber (who did not testify) as the type of person who believed that the world was against him and that he was always the victim and never responsible for his misfortune. The prosecutor did mention some evidence that could support that inference, *i.e.*, Barber suggested that others were responsible for Autumn's injuries and that he quit his job because he refused to shovel manure. The link, however, between the limited evidence presented at trial and the inference the prosecutor argued was too tenuous to be reasonable. But more importantly, the inference itself bore no relationship to the factors the jury needed to decide.

A prosecutor may not make statements intended to inflame the jury's passions or prejudices or attempt to distract the jury from its duty to rely on the evidence to decide the case. *State v. Adams*, 292 Kan. 60, 67, 253 P.3d 5 (2011). Whether Barber pitied himself and his circumstances did not make it more or less likely that he intentionally shook Autumn on February 7, 2008, and caused her injuries. See *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014) (emphasizing facts not relevant to proving the charged crime can be misconduct). The statements worked only to inflame the jury's prejudices and provoke it to dislike Barber personally, thereby distracting it from its duty to decide Barber's guilt based on the evidence in the case. The Court of Appeals correctly recognized that these statements amounted to misconduct. *Barber*, 2013 WL 1339884, at *7.

17

Consequently, we must determine whether this misconduct is reversible. First, the misconduct was not gross and flagrant. Comments generally amount to gross and flagrant misconduct when they were repeated, emphasized, calculated, or in violation of well-established laws. See *State v. Huddleston*, 298 Kan. 941, 954, 318 P.3d 140 (2014). Granted, the inference the prosecutor argued would only work to inflame the prejudices of the jury, which well-established laws prohibits. But the prosecutor did at least try to rely on evidence to support the inference. Moreover, the comments were not calculated and occurred during a single train of the prosecutor's thoughts. See *State v. Bridges*, 297 Kan. 989, 1016, 306 P.3d 244 (2013) (comments made in close proximity not generally viewed as repeated). All things considered, the comments were outside the prosecutor's latitude but not flagrantly so.

Second, the comments were not the result of ill will. In analyzing ill will, this court considers whether the comments were "deliberate or in apparent indifference to a court's ruling." *Bridges*, 297 Kan. at 1016. Again, while the comments went too far, there is no indication that was the prosecutor's intent. After all, she tried to link her statements to the evidence. And as to indifference to a court's ruling, Barber objected to the first comment and the trial court overruled the objection. So the prosecutor was not defying the trial court's ruling when shortly thereafter she briefly mentioned that Barber seemed to feel sorry for himself.

As to reversibility, we are convinced beyond a reasonable doubt that the misconduct did not affect the outcome of the trial. Multiple witnesses testified that Autumn exhibited no traumatic symptoms prior to her being alone with Barber. And multiple experts testified that given Autumn's substantial injuries—which were almost exclusively consistent with shaken baby syndrome—she would have exhibited symptoms immediately after the injury. It was undisputed that Barber was alone with Autumn when

18

she became symptomatic. The prosecutor's statement that Barber thought he was the victim was not gross and flagrant or the result of ill will, and it did not affect the jury's verdict.

*The medicine discredits him*

Next, Barber complains about the following statement in the prosecutor's closing:

"You may accept what you find credible; you may reject what you do not find credible. The bottom line is use your common sense. How do you assess every single day of your lives what you think is true, what rings true to you. You are men and women of different occupations. You're different ages, different experiences with kids. How do you eyeball somebody and assess whether or not it rings true with you? By actions; by their statements before and after; by the physical evidence of what you know surrounding the thing. Context is everything. *And in this case the medicine tells the story and discredits him.*" (Emphasis added.)

Barber argues this statement was improper as a comment on his credibility. A prosecutor cannot offer a personal opinion on the credibility of a witness because it amounts to unsworn and unchecked testimony. See, *e.g.*, *State v. Marshall*, 294 Kan. 850, 857, 281 P.3d 1112 (2012). But when the evidence presents the jury with two conflicting stories the prosecutor can argue why one version is not believable. *State v. King*, 288 Kan. 333, 352-53, 204 P.3d 585 (2009). Here, the evidence could support two versions of what happened when Barber was alone with Autumn—Barber shook her or Barber did not shake her. The prosecutor did not call Barber a liar; rather, she reminded the jury of the medical evidence that Autumn's injuries would have immediately caused symptoms. Because there was no dispute that Barber was the only one with Autumn when she became symptomatic, the medical evidence supported a version of events in which Barber shook her. This statement did not amount to misconduct because, as the Court of

19

Appeals concluded, the prosecutor did not offer an opinion on the credibility of any witnesses. *Barber*, 2013 WL 1339884, at *7.

*Barber's immature response to parenting corrections*

Third, Barber argues the prosecutor committed misconduct by making the following arguments:

> "Look at his statements. You know, Edmondson told you this and he told this to Brad Cordts as well; I try not to handle her. I won't handle her when she's crying. He recognizes in himself that. I'm afraid I won't be able to get her to stop. And when confronted with all these other witnesses that have disclosed how rough he is, how he has shaken before, you know, *it's almost a juvenile response, an immature response*. [Objection for facts not in evidence sustained.] *His response to that is he thinks shaking is okay*. [Objection for facts not in evidence sustained.]" (Emphasis added.)

"This court has repeatedly emphasized that it is improper for a prosecutor to comment on facts not in evidence." *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013). Here, the prosecutor likely was attempting to refer to Conner's statement to the investigating officer in which she mentioned one occasion when Barber got frustrated with Autumn's crying and shook her in Karen's presence. When Karen tried to take Autumn, Conner testified that Barber said, "I know how to raise this baby. She's my kid." Nevertheless, no witness testified that Barber ever responded immaturely or thought that shaking was okay, meaning that the prosecutor's comments were more than mere reasonable factual inferences—a point the trial court recognized when it sustained the defense's objections. See *Bennington*, 293 Kan. at 531 (a prosecutor can draw and argue reasonable inferences from the evidence). Consequently, the statements were misconduct, and we must consider the next step of the analysis.

20

We do not view the first statement as gross and flagrant. But by sustaining the objection to the first comment, the trial court put the prosecutor on notice that she should not go outside the evidence. When she returned to the same subject, her conduct was gross and flagrant.

Turning to ill will, the comments did not appear deliberate. When the trial court sustained Barber's initial objection, the prosecutor attempted to rephrase her thought. And when faced with another sustained objection, the prosecutor moved on. She perhaps miscalculated her ability to comply with the court's ruling, but we do not find that she acted with indifference to it, which is indicative of ill will. See *Bridges*, 297 Kan. at 1016.

Here, too, the State can establish beyond a reasonable doubt that the misconduct had no effect on the verdict. As before, evidence established that Autumn did not exhibit any traumatic symptoms until she spent time alone with Barber. And multiple experts testified that Autumn would have exhibited symptoms immediately after being injured. Compelling evidence pointed to Barber.

Moreover, in determining the potential prejudice stemming from these improper statements, we consider the ameliorating effect of a jury admonition. *State v. Simmons*, 292 Kan. 406, 422, 254 P.3d 97 (2011). The trial court sustained Barber's objections, which the defense premised on the prosecutor's arguing of facts not in evidence. And the trial court later instructed the jury to disregard any statements by counsel that the evidence did not support. We presume the jury followed that instruction. See *State v. Race*, 293 Kan. 69, 84, 259 P.3d 707 (2011). Thus, although misconduct, the statements did not deny Barber a fair trial or compel the reversal of his convictions.

21

*Garbage in, garbage out*

For his final prosecutorial misconduct claim, Barber challenges the prosecutor's characterization of defense arguments about the timing of events. Prior to concluding, the prosecutor discussed the expert testimony about Autumn's injury; specifically, the prosecutor discussed a physician's testimony that Autumn would have become symptomatic immediately after being injured. She then reminded the jury that Barber was alone with Autumn when Autumn became symptomatic. As evidence conflicted about the length of time Barber was alone with Autumn, the prosecutor attacked Barber's narrower timeline:

> "Timeline, value in value out; *garbage in, garbage out*. The beginning of [the] timeline is only as good as the credibility from when they say it starts. When did he get home, folks? Did Karen Barber do this? What we know is that he left J & M Farms at 9:30. Then he says, I got home at 10:30. He says to Lamb on tape, I got home 10:30, 10:45. And then it starts to turn to 11:00. You've got to ask yourselves what was going on between 10:30 and 11:15 when the 911 call was made. How much opportunity is that? [Barber] is responsible. He was alone with that child when she crashed." (Emphasis added.)

During the prosecutor's rebuttal, she opened with:

> "*Garbage in, garbage out*. If the timeline is as he says it is; Karen Barber did this, Karen Barber committed this crime, his timeline is only as good as how long was he alone with the child before the symptoms developed." (Emphasis added.)

Again, a prosecutor may not comment on the credibility of a witness or otherwise express personal, unchecked, and unsworn opinions. *Marshall*, 294 Kan. at 857; *State v. Anthony*, 282 Kan. 201, 210, 145 P.3d 1 (2006). But, as recognized by the Court of Appeals, the prosecutor's statements here did not directly express an opinion or comment

on Barber's credibility. *State v. Barber*, No. 106,911, 2013 WL 1339884, at *7 (Kan. App. 2013).

A prosecutor may use rhetorical devices to bring the evidence in a case into a meaningful context. See *State v. Hilt*, 299 Kan. 176, 198, 322 P.3d 367 (2014). Here, the prosecutor did not call Barber's timeline garbage; rather, she juxtaposed "value in, value out" with "garbage in, garbage out." This contrast left the jury free to decide what to believe—if it found Barber credible, then his timeline would likely be credible. Conversely, if it found Barber not credible, then his timeline would likely not be credible. In rebuttal, the prosecutor arguably took it one step further by mentioning only "garbage in, garbage out." But she followed up by stating, "*If* the timeline is as he says it is." (Emphasis added.) She did not expressly offer her opinion and left the jury to decide whether to believe Barber's timeline or not. Though a close question, the prosecutor approached the line between proper and improper arguments without crossing it.

### 4. K.S.A. 22-3421

Under K.S.A. 22-3421: "The verdict shall be written, signed by the presiding juror and read by the clerk to the jury, and the inquiry made whether it is the jury's verdict. . . . [I]f no disagreement is expressed, and neither party requires the jury to be polled, the verdict is complete." In this case, the clerk read the verdict to the jury but there was no inquiry whether it was the jury's verdict. Barber did not object, and he declined the trial court's offer to have the jury polled. He now argues the trial court's failure to strictly comply with K.S.A. 22-3421 mandates reversal of the verdict.

Barber recognizes that he is raising this issue for the first time on appeal, which generally renders an issue unpreserved for review. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014) (issues not raised before the trial court cannot be raised on appeal).

23

He argues, however, we can hear the issue for the first time on appeal under two of three generally recognized exceptions to the rule: (1) The issue involves only a question of law that is determinative of the case, and (2) the issue implicates a fundamental right. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014) (recognizing exceptions permitting appellate consideration of issues raised for the first time on appeal).

Fatal to his claim, however, we rejected an identical first-time-on-appeal argument after Barber had filed his petition for review in this case. "Issues regarding a trial judge's compliance with the procedures set out in K.S.A. 22-3421 for inquiring about a jury's verdict in a criminal trial may not be raised for the first time on appeal. None of the exceptions to the general rule requiring preservation of an issue for appeal apply." *State v. Cheffen*, 297 Kan. 689, Syl. ¶ 3, 303 P.3d 1261 (2013); see also *State v. Brown*, 298 Kan. 1040, 1055-56, 318 P.3d 1005 (2014) (review of the issue necessarily involves factual conclusions, and the right to a unanimous verdict is statutory in Kansas rather than fundamental). A challenge to a trial court's compliance with K.S.A. 22-3421 must come in the form of a contemporaneous objection or in a posttrial motion. *Cheffen*, 297 Kan. at 698-99. Because Barber pursued neither avenue of relief, he cannot challenge the verdict on appeal.

5. CUMULATIVE ERROR

Barber next argues that the cumulative prejudice arising from the errors in his case denied him a fair trial. Cumulative error occurs when the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. But no prejudicial error may be found under this rule if the evidence against the defendant is overwhelming. *State v. Lewis*, 299 Kan. 828, 858, 326 P.3d 387 (2014).

24

Here, there were two instances of prosecutorial misconduct; the prosecutor appealed to the jury's prejudices and argued facts not in evidence. But even taken together, the errors did not substantially prejudice Barber. Indeed, the evidence against him was overwhelming. Experts testified that the type of injuries present in Autumn were almost exclusive to shaken baby syndrome; the symptoms Autumn exhibited would have begun immediately after her injury; and Autumn exhibited symptoms only after being in the sole care of Barber, whom witnesses had seen shake Autumn on prior occasions.

### 6. *IVORY*

Barber argues the trial court violated his constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), by using prior convictions in his criminal history score to enhance his sentence without requiring the criminal history score to be included in the complaint and proven to a jury beyond a reasonable doubt. As he recognizes, we have rejected his argument. See *State v. Williams*, 299 Kan. 911, Syl. ¶ 8, 329 P.3d 400 (2014); *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). Barber wishes to preserve this issue for federal review, and he makes no argument to persuade us to overrule precedent.

### CONCLUSION

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

* * *

LUCKERT, J., dissenting:  I respectfully dissent from the majority's conclusion that the trial court did not err in instructing the jury it could consider evidence of prior "bad

25

acts" as proof of a continuing course of conduct." This instruction essentially said, "If you believe William Barber, Jr., shook Autumn in the past, you can find him guilty of doing so on February 7, 2008."

In essence, the court instructed the jury to consider the very material fact that K.S.A. 2010 Supp. 60-455 prohibits—*i.e.*, a propensity or disposition to commit the crime that is inferred from the prior commission of the "bad acts." K.S.A. 2010 Supp. 60-455 attempts to guard against jurors drawing prejudicial inferences from the admission of evidence establishing that the defendant committed a crime or civil wrong that is not the subject of the trial. Jurors who learn that a defendant has previously committed a crime may—indeed, are likely to—draw a negative inference about the defendant's character. K.S.A. 2010 Supp. 60-455 seeks to prevent the jury from drawing a more troubling, but related, inference—that the defendant acted in conformity with that bad character to commit the charged crime. To prevent this second inference, the rule excludes evidence of other crimes or civil wrongs when offered for the sole purpose of proving the defendant's propensity or disposition to commit the charged crime. See *State v. Breeden*, 297 Kan. 567, 577, 304 P.3d 660 (2013) (K.S.A. 2010 Supp. 60-455[a] applies to situations involving "'evidence that a person committed a crime or civil wrong on a specified occasion'" to infer a person has the disposition or a propensity to "'commit[ ] another crime or civil wrong on another specified occasion.'"); *State v. Jones*, 277 Kan. 413, 424, 85 P.3d 1226 (2004) ("'[A]dmission of prior wrongful acts simply to show the defendant's bad character, notwithstanding that one possessed of a bad character is more likely to commit a crime than one who is not, is likely to prejudice the jury and blind it to the real issue of whether the defendant is guilty of the crime charged.'").

At the same time, the rule recognizes that evidence can be inadmissible for one purpose but admissible for another. If admissible for one purpose, to guard against prejudice flowing from the inadmissible purpose, the trial court must instruct the jury that

26

it may only consider the evidence for a designated limited purpose. The limiting-instruction safeguard is critical to accomplishing the purpose of K.S.A. 2010 Supp. 60-455(a). See *State v. Inkelaar*, 293 Kan. 414, 424, 264 P.3d 81 (2011); *State v. Gunby*, 282 Kan. 39, Syl. ¶ 3, 144 P.3d 647 (2006).

In this case, the wording of the limiting instruction nullified the safeguard. If the jury instruction had only listed other material facts that may be considered—such as motive, plan, identity, or even a relationship between the parties—the jury would have been directed away from a propensity inference. But allowing the jury to consider prior bad acts to prove Barber continued a course of conduct—to prove he would act in conformity with the character he had previously displayed—instructs the jury to draw the prohibited propensity inference. Thus, regardless of whether a reason existed to admit the evidence, instructing the jury to consider the evidence as proof of a course of conduct violated K.S.A. 2010 Supp. 60-455's intent.

Therefore, I would find error. Further, I would find that the error requires us to reverse Barber's convictions and remand this case for a new trial without a tainted instruction.

The prejudice that results from allowing the jury to consider Barber's continuing course of conduct cannot be understated. See *Jones*, 277 Kan. at 424. Granted, several physicians testified there would be an almost immediate physical manifestation of the injury caused by shaking the baby, and the evidence established that Barber was the only one present when Autumn experienced seizures. Nevertheless, the vague and differing evidence about the length of time between the seizures and Karen leaving Autumn in Barber's sole care creates a possibility the jury could have had a reasonable doubt about whether Barber or Karen was responsible for Autumn's injuries. It is reasonably probable that the evidence of Barber's prior conduct of shaking Autumn would have pushed the

27

jury toward the conclusion it was Barber and not Karen who was responsible. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (harmless error standard for violation of statute requires determination of whether there is a reasonable probability that the error affected the outcome of the trial in light of the entire record).

Further, instructing the jury it could consider the other crimes evidence to establish the relationship of the parties, even assuming that was permissible, does not cure the harm. At best it means the jury could consider the evidence for both a permissible and an impermissible reason. And the impermissible reason is so toxic it corrupts the jury verdict. This toxicity distinguishes this case from other cases where we held an overly broad limiting instruction did not require reversal of a conviction. We have stated that such an overbroad instruction may be deemed harmless only "if the defendant was not prejudiced by the inclusion of more material facts than were warranted by the evidence in the case." *State v. Edwards*, 291 Kan. 532, Syl. ¶ 11, 243 P.3d 683 (2010); see *State v. Wilson*, 295 Kan. 605, 620, 289 P.3d 1082 (2012) (examining whether erroneous jury instruction "caused jury confusion or other prejudice"). Here, the overly broad instruction allowed the jury to consider Barber's prior bad acts to be proof he would have continued his course of conduct and committed the charged crimes. As such, it was unduly prejudicial.

Consequently, I would reverse Barber's convictions. Furthermore, I would hold that the phrase "continuing course of conduct" can never be used in a K.S.A. 60-455 limiting instruction because doing so will always allow the jury to make an improper propensity inference.