NOT DESIGNATED FOR PUBLICATION

No. 117,208

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KERRY D. JENKINS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOHN J. KISNER JR., judge. Opinion filed June 22, 2018. Affirmed.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., PIERRON, J., and WALKER, S.J.

PER CURIAM: A jury convicted Kerry D. Jenkins of theft. The district court found his criminal history score was B and applied a special rule for sentencing because he had committed the theft while on postrelease supervision. The court sentenced Jenkins to 13 months of incarceration with the Kansas Department of Corrections and 12 months of postrelease supervision. Jenkins timely appealed. We affirm.

On October 21, 2014, Kelly Spires, the manager of a Save-A-Lot in Wichita, reported to police that a man had walked out of the store with a cart of groceries for which he had not paid.

1

Wichita Police Officer Robert Bachman responded to the scene and spoke with Spires. She told him she had been within 10 to 15 feet of the man and asked him if he had a receipt. She looked him right in the face and he looked directly at her. The man then walked out of the store, crossed the street, and entered a body shop. Spires stated the man was wearing a blue T-shirt, blue jeans, and a black scarf or head wrap. She told Bachman she believed he was still inside the body shop. Bachman reviewed Save-A-Lot's surveillance video and recognized the man as Jenkins.

Officer Bachman called for backup and went to the body shop. As he entered the shop, Chris Ponder, the owner, exited. Ponder did not match the description of the suspect. He denied seeing anyone with a shopping cart and gave Bachman permission to look inside the shop. Bachman spoke with a woman in the lobby who told him Jenkins was inside. Jenkins then stepped out from the back room. He matched the description provided by Spires. Bachman noticed some of the stolen items on the floor in the lobby and the cart was in the small back room with the rest of the groceries.

Officer Bachman placed Jenkins under arrest and gathered the stolen items in the cart. Another officer returned the cart to the store. Bachman placed Jenkins in the back of the patrol car and drove him across the street to Save-A-Lot. Spires identified Jenkins as the man who had taken the groceries and cart. Spires scanned the recovered merchandise, determining the value was $145.73. At trial, she testified her identification of Jenkins was based on the description she had provided Bachman, Jenkins' facial features, and his build. She testified that shoppers are not permitted to take shopping carts with them and the value of the shopping cart was greater than $1 but less than $1,000.

The above facts were established as the State's case-in-chief at the jury trial on November 1, 2016. Jenkins stated that in October 2014 he had stayed at the body shop for a couple nights while his car was being fixed. When he woke up on the morning of

2

October 21, 2014, he heard Ponder and the female talking in the other room. After he washed up, he headed out the door just as Bachman entered and arrested him for shoplifting. Jenkins denied having left the body shop that morning.

Jenkins testified he does not think he and Ponder look alike, but other people say they do. He stated that they are similar in height, build, and complexion. Jenkins stated that Ponder had been having money problems and he had bought Ponder dinner the night before. He testified there was no refrigerator in the spare room or storage area for groceries. He conceded the groceries could likely fit in the trunk of a car.

In closing arguments, the State reiterated the jury's duties to determine credibility and consider whether the elements of theft had been established. The State noted the only element of the crime in question was the identity of the person who had stolen the groceries, which required a credibility determination and the use of common sense. The State compared the two versions of the events and concluded by encouraging the jury to use common sense in determining which version made the most sense.

In his closing arguments, Jenkins contended that Officer Bachman mistakenly identified him as the suspect and questioned the suggestive nature of Spires' identification while he sat in the back seat of the police car. Jenkins further questioned Bachman's identification because the State did not introduce the video into evidence. He alleged Ponder was the person in Save-A-Lot. He suggested that Bachman focused on finding Jenkins and did not pay attention to whether Ponder matched the description of the suspect because Bachman could not remember what Ponder wore that day. Jenkins claimed Bachman disregarded Ponder's suspicious demeanor as he focused on Jenkins. He claimed Bachman did not do any follow up because he knew Ponder and Jenkins. He stated, "Here you don't have an investigation. You have a witch hunt and that's what this amounts to."

In rebuttal, the State reminded the jurors they were "to decide the case on the evidence you do have, not conjecture, not guessing games about what all might be out there and who knew what, who did what." It then contended the statements about Ponder were conjecture and again encouraged the jury to make a determination on what made sense. The State said, "There is this notion that it is this witch hunt. For who, for why? The officer gets called out to a call, he's got no ax to grind, there has been no evidence in that." The State noted that "[i]t would be nice to think there is some sort of a witch hunt because then that would help Mr. Jenkins' story, [his] version of what happened that morning, but it is not, there is no evidence of that." The State reminded the jury of Bachman's testimony that he knew everybody in that neighborhood and stated "there is nothing nefarious about it."

The jury found Jenkins guilty of theft. Following the reading of the verdict, the district court polled the jury and all jurors agreed the verdict was their verdict. The court accepted the verdict and found Jenkins guilty of one count of theft, a severity level 9 person felony.

At the sentencing hearing, the presentence investigation (PSI) report indicated Jenkins had a criminal history score B, to which both parties agreed. The PSI report also indicated that Jenkins was on postrelease supervision for a previous conviction at the time of this theft. The State recommended the standard sentence of 14 months of incarceration, noting that the 39 entries in the PSI report demonstrated that he was not amenable to probation. Jenkins argued his motion for a durational or dispositional departure. He pointed out that all of the stolen items had been recovered and reshelved for sale. Jenkins noted that a majority of his criminal history was nonviolent and he had worked as a trustee in the jail through the pendency of the case. The district court noted Jenkins' continued criminal behaviors and found there was no basis to grant the

4

departure. However, the court sentenced Jenkins to the low box sentence of 13 months in the department of corrections with 12 months of postrelease supervision.

Jenkins timely appealed his conviction based on prosecutorial error in the closing statements and the constitutionality of the use of his criminal history in determining his sentence.

We will first determine whether the State committed prosecutorial error that warrants a reversal of Jenkins' conviction.

Jenkins claims the State erred by improperly bolstering Officer Bachman's testimony, mischaracterizing the defense's theory to appeal to the passions and prejudices of the jury, and indicating its opinion of the defense theory in its rebuttal closing argument. Jenkins asserts the State committed such error in saying:

> "All this is conjecture. We can sit here for the next two hours, two days, two weeks, we can guess all the other stuff, but ask yourself, does it make sense? So okay, if Mr. Ponder were here, what would that evidence look like? Mr. Ponder, there is evidence that two people said you're not the guy that took the property, two people that said they either confronted you at the store or were taken back to the store and you're not the guy that took the property. Okay, so why would Mr. Ponder be here? There is this notion that it is this witch hunt. For who, for why? The officer gets called out to a call, he's got no ax to grind, there has been no evidence in that.
>
> "Remember, it says in the instructions, arguments and statements of counsel if they are not supported by the evidence, disregard them. It would be nice to think there is some sort of a witch hunt because then that would help Mr. Jenkins' story, his version of what happened that morning, but it is not, there is no evidence of that. You heard even Officer Bachman said, I know everybody in the neighborhood, there is nothing nefarious about it. I'm working the beat, I meet the same people, I know who is who."

*Standard of Review*

Under the modified standard in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), the appellate court uses a two-step process to evaluate claims of prosecutorial error:

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]"

"Every instance of prosecutorial error will be fact specific, and any appellate test for prejudice must likewise allow the parties the greatest possible leeway to argue the particulars of each individual case." 305 Kan. at 110. Even if the prosecutor's actions were egregious, reversal of a criminal conviction is not an appropriate sanction if the actions did not prejudice the defendant. 305 Kan. at 114.

Any argument "must accurately reflect the evidence, accurately state the law, and cannot be 'intended to inflame the passions or prejudices of the jury or to divert the jury

from its duty to decide the case based on the evidence and the controlling law.'" *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012) (quoting *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 [2004]). Even if the prosecutor's statement was extemporaneous rebuttal to the defense's argument, it may be prejudicial. *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015) (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct/error, although it is factor to consider).

*Bolstering*

Jenkins asserts the State impermissibly bolstered Officer Bachman's testimony by claiming he had "no ax to grind" to support its contention that he correctly identified Jenkins in the surveillance video. Jenkins claims that while the State referred to Bachman's testimony that he knew everybody in the neighborhood, it went a step too far by concluding that his identification was not nefarious. He contends that such a statement was not based in the evidence but in the State's interpretation of the evidence.

It is "improper for a prosecutor to attempt to bolster the credibility of the State's witnesses." *State v. Donaldson*, 279 Kan. 694, 708, 112 P.3d 99 (2005). Nevertheless, courts afford prosecutors wide latitude to explain "'to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses.'" *State v. Sprague*, 303 Kan. 418, 428-29, 362 P.3d 828 (2015) (quoting *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 [2009]). Further, prosecutors have

> "'"freedom . . . to craft an argument that includes reasonable inferences based on the evidence"' and '"when a case turns on which version of two conflicting stories is true, [to argue] certain testimony is not believable."' . . . But a prosecutor must do so by basing the comment on evidence and reasonable inferences drawn from that evidence and without stating his or her own personal opinion concerning a witness' credibility or accusing a

7

defendant of lying. [Citations omitted.]" *State v. Armstrong*, 299 Kan. 405, 427, 324 P.3d 1052 (2014).

Prosecutors have some leeway to use colorful language when arguing the State's case. *State v. Maestas*, 298 Kan. 765, 777, 316 P.3d 724 (2014). The Kansas Supreme Court recently reviewed caselaw from various states in concluding that the State's use of the term "ridiculous" had been fair comment on the evidence when used in response to the defense's claim that the State's case was "simply ridiculous." *State v. Butler*, 307 Kan. 831, 416 P.3d 116, 142, (2018) (citing *State v. Kelly*, 106 Conn. App. 414, 431 n.11, 942 A.2d 440 [2008] [the State's argument that the defense theory was "preposterous" was a permissible appeal to the jury's common sense in evaluating the weaknesses of the defendant's case]; *People v. Matuszak*, 263 Mich. App. 42, 55-56, 687 N.W.2d 342 [2004] [stating that while the prosecution could have characterized the defense argument differently, prosecutors need not state arguments in the blandest possible terms]; *State v. Mohamed*, No. A12-0069, 2012 WL 6734447, at *4 [Minn. Ct. App. 2012] [unpublished opinion] [the State's implication that the defense was ridiculous, even laughable, based on the facts, was blunt, but not misconduct]).

Here, the contested comments were made as a reasonable response to Jenkins' closing arguments and the evidence presented. During cross-examination of Officer Bachman, Jenkins presented the idea that Bachman targeted him as the suspect, ignoring any other possibility:

> "Q. And I want to make sure that Chris Ponder never told you that anybody pushed a cart of groceries in the store; right?
> "A. That's correct.
> "Q. And so, like I said, you mentioned that he was in a hurry to get out of there, so you didn't think anything was suspicious or anything like that?
> "A. I knew he wasn't the suspect I was looking for.
> "Q. Because you had an eye on and you were only looking for Kerry Jenkins?

8

"A. Because I know Chris Ponder and I know Kerry Jenkins and I knew when I saw the video at the store and I knew Kerry was the suspect."

In recross-examination, after Bachman testified that he was aware of his surrounding, Jenkins asked:

"Q. Officer, you testified that you—even though you're looking for certain things that you're always aware of your surroundings?
"A. That's correct.
"Q. However, today we've demonstrated that maybe it is not relevant, but in this instance you were not aware of all your surroundings?
"A. No, that's not correct.
"Q. So can you tell me what Chris Ponder was wearing[?]
"A. At this point, that was two years ago, no, I can't.
"Q. And you couldn't describe whether the body shop had an open or shut garage door?
"A. No, I wasn't paying any attention to that at that point. They said Mr. Jenkins or the suspect had gone inside the detail shop which is where I went.
"Q. So you weren't paying attention at that point, but you said that you're always aware of your surroundings?
"A. I'm always aware of my surroundings. I was aware of the fact that Mr. Ponder was not my suspect and I looking for the suspect in the larceny."

In summing up Officer Bachman's testimony, Jenkins stated that Bachman immediately focused on him though it was more likely that Ponder was the thief. He further noted that Bachman did not remember what Ponder was wearing or whether the garage door was open. Jenkins stated that Bachman was sure he was the thief and ignored indicators that Ponder was the one who took the groceries. Referring to Bachman's lack of follow up with Ponder, Jenkins stated, "Well, here you have a witch hunt and that's what this amounts to."

The State's use of the term "ax to grind" is its response to Jenkins' assertion that Officer Bachman targeted him and ignored indicators that Ponder had stolen the

9

groceries. Jenkins stated that Bachman "bee lined" toward him at the body shop. He alleged Bachman's investigation was a "witch hunt" inferring that his focus was on getting Jenkins, not on finding the person responsible for the theft. In saying Bachman had "no ax to grind," the State simply used colorful language to counter the defense's theory that Bachman was just out to get Jenkins. The State is not required to use bland language when presenting to the jury what to look for with regard to witness credibility after the defense attacked Bachman's testimony. The defense's theory required the jury to believe that Bachman was pursuing Jenkins and ignoring other facts.

Jenkins further claims the State erred by saying there was nothing nefarious in Officer Bachman's identification of him. As above, the State's use of colorful language in conveying that Bachman was not out to get Jenkins that day is not improper. The use of the word "nefarious" directly linked to the defense's theme that the investigation had been a witch hunt. Both terms refer to wicked or impious motives. The State made the statement after referring to Bachman's testimony that he knew everybody in that neighborhood. It was a response to Jenkins' claim that Bachman targeted him rather than investigated the crime.

Both statements complained of were fair comments on the evidence when used in response to the defense's theme that Bachman's investigation was a witch hunt. The State did not impermissibly bolster Bachman's testimony.

*Mischaracterization*

Jenkins asserts the State improperly referred to the defense's theory as a claim that the investigation had been a witch hunt. However, in his closing arguments, Jenkins stated, "Well, here you don't have an investigation. You have a witch hunt and that's what this amounts to." The defense's theory had two-prongs: (1) the investigation was a witch

10

hunt, in which Bachman targeted Jenkins despite the evidence; and (2) Ponder stole the groceries.

In rebuttal, the State remarked, "There is this notion that it is this witch hunt." This statement accurately summed up the defense's portrayal of Bachman's investigation. The State later asserted, "It would be nice to think there is some sort of a witch hunt because then that would help Mr. Jenkins' story, his version of what happened that morning, but it is not, there is no evidence of that." The State's remarks were directly responsive to Jenkins' claim that the investigation was a witch hunt. The State was rebutting that assertion and referring to the evidence that the investigation was not a witch hunt as Jenkins claimed. The State did not mischaracterize the Jenkins' theory but focused only on the first prong, under which the jury had to believe Bachman pursued Jenkins at the risk of arresting the wrong man. The State did not improperly mischaracterize Jenkins' defense theory.

*Personal Opinion*

Jenkins further alleges the State impermissibly left no doubts in the jurors' minds that it did not believe Jenkins' theory through bolstering Bachman's testimony and repeatedly referring to the defense as a witch hunt. He claims by including the statements complained of above, the State improperly offered its personal opinion of Jenkins' theory of defense. A "prosecutor may not state his or her personal belief as to the reliability or credibility of testimony given at a criminal trial." *State v. Brinklow*, 288 Kan. 39, Syl. ¶ 6, 200 P.3d 1225 (2009). However, prosecutors may make statements in closing arguments that draw reasonable inferences from the evidence. *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011). When a case turns on two conflicting stories, the State may infer that certain testimony is not believable. 292 Kan. at 830.

11

Here, the complained of statements were proper in the context of evidence presented in trial, particularly Jenkins' cross-examination. Further, the statements were an adoption of the theme Jenkins used in his closing arguments. While the State is prohibited from expressing its opinions as to the credibility of witnesses, it is not prohibited from conveying to the jury that it does not believe the theory of defense as that is inherent in the trial. While Jenkins presented part of his defense theory through his testimony, the State's remarks were directed to the defense theory that was unraveled through Bachman's cross-examination and in closing arguments. The State's assertions did not go to its belief as to the credibility of Bachman's testimony. Therefore, the State did not improperly express its opinion of the credibility of any witness' testimony.

*Prejudice*

Because the statements were not improper when considered in the context of the evidence and they were a reasonable response to Jenkins' closing arguments, we do not need to assess prejudice. However, even if we were to determine the statements were improper, the statements did not prejudice Jenkins.

Jenkins contends he was prejudiced by the complained of remarks because each of the statements went to the heart of his theory of defense. He further contends the State cannot reasonably argue that the statements had no reasonable possibility of affecting the outcome of the trial.

When the appellate court determines that an error occurred, it must then determine whether the State proved beyond a reasonable doubt that the error did not influence the verdict. *State v. Kahler*, 307 Kan. 374, 382, 410 P.3d 105 (2018). In *Sherman*, 305 Kan. at 109, the Kansas Supreme Court noted that while different courts articulate harmlessness differently, all aim to determine whether the defendant's due process rights to a fair trial were prejudiced. In determining whether the State has shown that there is no

12

reasonable possibility that the error contributed to the verdict, this court must consider all indicators of prejudice, as argued by the parties. 305 Kan. at 111.

The State asserts the statements did not prejudice Jenkins because the jury had been properly instructed to only consider the evidence and exhibits and to presume Jenkins was not guilty. The jury had been properly instructed to disregard statements that were not supported by evidence; and during deliberations, the jury asked to review a transcript of Spires' testimony.

While the jury instruction does not excuse an improper statement, the district court may consider that as a factor in its determination. See *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015). When a trial court instructs a jury to disregard any statements by counsel not supported by evidence, appellate courts presume the jury followed that instruction. 302 Kan. at 383. Further, as presented by the State, the jury demonstrated that the verdict was not based on the State's challenged remarks. During deliberations, the jury submitted a written request for "a transcript or review of the store manager's statement and time frame of events." The jury request demonstrated that the jurors considered all evidence as the contested remarks pertained to Bachman's investigation and testimony, not Spires' testimony. Further, the statements were a direct response to Jenkins' closing arguments and to of his theme of a witch hunt.

We also must determine if the district court violated Jenkin's constitutional rights by using his proper convictions to increase his sentence.

*Standard of Review*

A challenge to the constitutionality of the Kansas Sentencing Guidelines Act (KSGA) involves a question of law, over which we have unlimited review. *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2002).

*Discussion*

Jenkins contends the district court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution by using his prior convictions to increase his maximum penalty. He asserts that *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), requires any fact that increases the maximum penalty to be determined beyond a reasonable doubt by the jury. He acknowledges the Kansas Supreme Court has previously decided this issue in *Ivory*, 273 Kan. 44, Syl., but he included it because he stands by the assertions raised in *Ivory* to preserve the issue for federal review. The State notes that because the Kansas Supreme Court has repeatedly rejected this argument, Jenkins would have had to present an argument or legal authority giving reason for us to reconsider the issue.

In *Almendarez-Torres v. United States*, 523 U.S. 224, 226-27, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), the Court determined that the United States Constitution does not require the prosecution to submit the fact of a prior conviction to a jury to be proven beyond a reasonable doubt. The *Apprendi* Court stated: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In deciding *Apprendi*, the Supreme Court did not overrule *Almendarez-Torres*, but instead created an exception to the rule. *Apprendi*, 530 U.S. at 489-90.

The Kansas Supreme Court further addressed this issue in *Ivory*, determining use of a defendant's criminal history score as a basis for sentencing under the KSGA does not present an *Apprendi* issue. 273 Kan. 44, Syl. Therefore, the use of an offender's criminal history as a basis for sentencing is constitutional.

Affirmed.

14