NOT DESIGNATED FOR PUBLICATION

No. 117,047

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ALTON SILVERSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed July 13, 2018. Affirmed in part, reversed in part, and remanded with directions.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., GREEN and MCANANY, JJ.

PER CURIAM: Alton Silverson appeals his convictions for aggravated burglary, aggravated assault, battery, criminal threat, and criminal possession of a weapon by a convicted felon. On appeal, Silverson argues: (1) there was insufficient evidence to support his conviction for criminal possession of a weapon by a convicted felon; (2) the jury instructions as to aggravated burglary and criminal threat were erroneous; (3) the district court erred in denying his pretrial motions to dismiss his counsel; (4) the court erred in denying his posttrial motions for new counsel; (5) cumulative trial error warranted a new trial; and (6) the court's requirement that Silverson register as a violent

1

offender unlawfully increased his punishment based upon improper judicial fact-finding in violation of his constitutional rights.

The State concedes error on Silverson's first and fourth points. Finding no additional errors, we affirm in part, reverse in part, and remand for further proceedings.

FACTS

Silverson was charged with several crimes resulting from an incident that occurred at the Kunkle residence, where Rita and David lived with their adult daughter, Ruth. The events were recounted by the Kunkle family at trial.

As Rita and Ruth were returning home from the grocery store on the evening of December 2, 2015, they saw a car pull into a driveway across the street. Rita went inside to start cooking dinner, and Ruth began gathering items from the car to carry into the house. While still outside, Ruth saw a male, who she identified at trial as Silverson, get out of the car across the street and yell at another person who remained in the car. Two women exited the vehicle, and Ruth saw Silverson hit one of the women, who was later identified as Melanie Peterson. Peterson ran toward Ruth, seeking help. Before Peterson reached the Kunkles' house, Silverson caught up to her and started kicking and beating her, calling her "'bitch'" and accusing her of stealing his "'dope.'" Ruth and the other woman tried to calm Silverson down and pull him away from Peterson, but they were unsuccessful.

Ruth called David, who was inside the house. By the time David came outside, Silverson had left the scene and Peterson was lying in the street asking for help. As David began helping Peterson off the ground, Silverson reappeared and started yelling at Peterson, threatening her, calling her a bitch, and accusing her of stealing his dope. Ruth testified that Silverson threatened to "shoot [them] up" if they called the cops. David

2

testified that Silverson threatened them that he would come back and "shoot up our house if we didn't get out of his way."

David tried to help Peterson up again, but she fell down onto the front yard and Silverson began punching and kicking her. David and Ruth both testified that Silverson ran across the street and returned to the Kunkles' property with a knife. Ruth positioned herself between Silverson and Peterson. David testified that Silverson raised the knife in a threatening manner toward Ruth's and David's chests and exclaimed he was "dispensing street justice" because Peterson stole his dope.

When Silverson briefly left the scene again, David helped Peterson up and began walking with her toward the house. When Peterson saw Silverson return and head toward her, she ran into the house and hid in a bathroom. Silverson ran after her into the house, still carrying the knife. Rita was in the house, calling the police. As Silverson burst through the door, he pushed Rita, causing her to fall against a desk and knocking the phone from her hand. Silverson ran to the bathroom door behind which Peterson was locked. He pounded on the door, yelled at her, accused her of stealing, and threatened to administer street justice. Ruth testified that Silverson threatened her and her parents with the knife in an effort to gain access to the bathroom.

Ruth tried to call the police without Silverson seeing her, but he saw her and asked if she was calling the cops. When Ruth told him she was not, Silverson grabbed her phone from her and dropped it on the ground. Silverson pointed the knife at Ruth's chest. Rita screamed "'Police'" as a tactic to scare Silverson, which worked. Silverson ran away.

The Kunkles locked themselves in the house with Peterson and waited for the police. The police arrived and investigated the car that Silverson parked across the street. The neighbors told the police the driver went by the nickname of "Sideways," which the police used to identify Silverson.

3

The police interviewed Silverson two days after the incident. Silverson explained that he and the other woman in the car were giving Peterson a ride, and Peterson took $10 out of the center console of his car and ran into a house. Silverson claimed that he followed her into the house to get his money back. He insisted he was not violent and did not have a weapon of any kind. Silverson denied threatening or even interacting with the Kunkles.

The State charged Silverson with aggravated burglary, aggravated assault of Ruth, aggravated assault of David, battery of Peterson, criminal threat, and criminal possession of a weapon by a convicted felon. A jury convicted Silverson as charged. The district court sentenced Silverson to 178 months in prison and 24 months' postrelease supervision. The court also found Silverson used a deadly weapon to commit the offenses and ordered him to register as a violent offender under the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq.

ANALYSIS

1. *Sufficiency of the evidence*

Silverson first argues that there was insufficient evidence to convict him of criminal possession of a weapon by a convicted felon because the State failed to introduce any evidence to prove a key element of the charge—that Silverson's prior conviction occurred within the last 10 years. When the sufficiency of the evidence is challenged in a criminal case, the appellate court must consider all of the evidence in a light most favorable to the prosecution and then determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt. *State v. Parker*, 282 Kan. 584, 597, 147 P.3d 115 (2006).

4

The court properly instructed the jury that in order to convict Silverson of criminal possession of a weapon by a convicted felon, it had to determine that, at the time of the incident, Silverson: (1) possessed a weapon—here, a knife; (2) had been convicted of a felony that prohibits the possession of a weapon within the 10 years preceding the current possession of a weapon; and (3) was in possession of a firearm at the time of the prior crime. See K.S.A. 2017 Supp. 21-6304.

The only evidence submitted to the jury at trial regarding this charge, however, was limited to the following stipulation:

> "Defendant admits that he, Alton Silverson, has been convicted of a felony which prohibits the possession of a weapon and that the defendant was found to have been in possession of a firearm at the time of the prior crime, and has not had the prior conviction expunged or been pardoned for such crime."

Silverson argues that this stipulation does not meet the State's burden to prove the elements of possession of criminal possession of a weapon by a convicted felon because it does not establish that Silverson's prior conviction occurred *in the past 10 years*. The State concedes error. Accordingly, we reverse Silverson's conviction for criminal possession of a weapon by a convicted felon and remand Silverson's case for resentencing.

2. *Jury instructions*

Silverson claims the district court failed to properly instruct the jury on the mental state required to convict him on the aggravated burglary and criminal threat charges. Silverson acknowledges the individual instructions provided to the jury on aggravated burglary and criminal threat correctly identified each as a crime that had to be intentionally committed. But Silverson claims the court erred by also providing a general

5

and conflicting instruction, which advised the jury that the lower mental state of "knowingly" applied to *all charges*.

When analyzing jury instruction issues, appellate courts make three determinations: (1) whether the issue can be reviewed, (2) whether any error occurred, and (3) whether any error requires reversal. *State v. Barber*, 302 Kan. 367, 376-77, 353 P.3d 1108 (2015).

With regard to reviewability, the record reflects that Silverson did not object to the challenged instructions at trial. Ordinarily, an appellant may not challenge an issue that was not preserved for appeal. But there is a special rule for jury instructions. This court will review those challenges for "clear error." See K.S.A. 2017 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict . . . or the failure to give an instruction is clearly erroneous.").

With regard to whether an error occurred, we look to the legal and factual propriety of the instruction, using an unlimited review of the entire record. *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012). An instruction is legally appropriate if it fairly and appropriately states the applicable law. Like all questions of law, we review this legal question using an unlimited standard of review. An instruction is factually appropriate if there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support a factual basis for the instruction. 295 Kan. 506, Syl. ¶ 4.

In this case, Silverson was charged with aggravated burglary and criminal threat. The jury instructions for those charges stated:

"The defendant is charged in Count One with the crime of Aggravated Burglary. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1.  The defendant entered a residence on South Gold Street, Wichita, Kansas;

"2.  The defendant did so without authority;

"3.  The defendant did so with the intent to commit Criminal Threat therein;

"4.  At the time there were human beings in the residence; and

"5.  This act occurred on or about the 2nd day of December, 2015, in Sedgwick County, Kansas."


"The defendant is charged in Count Five with the crime of Criminal Threat. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1.  The defendant threatened to commit violence and communicated the threat with the intent to place Ruth Kunkle and/or David Kunkle in fear; and

"2.  This act occurred on or about the 2nd day of December, 2015, in Sedgwick County, Kansas."


Again, Silverson acknowledges that these instructions properly stated the elements of the respective crimes, including the applicable mental culpability. But in addition to the instructions above, the district court also provided a general instruction on culpability to the jury:

"The State must prove that the defendant knowingly committed each of the crimes charged, as set forth in the instructions defining the elements of those crimes.

"A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about."


Silverson claims the general instruction conflicted with the specific aggravated burglary and criminal threat instructions. Specifically, Silverson argues the general instruction erroneously directed the jury that the State only had to prove he knowingly

7

committed *each of the crimes charged*, which would have included the specific intent aggravated burglary and criminal threat charges.

We begin by noting that each of the offenses with which Silverson was charged, other than aggravated burglary and criminal threat, required knowingly as its culpable mental state. K.S.A. 2017 Supp. 21-5412(b)(1) (aggravated assault); PIK Crim. 4th 54.280 (2016 Supp.); K.S.A. 2017 Supp. 21-5413(a)(1), (g)(1) (battery); PIK Crim. 4th 54.300 (2016 Supp.); K.S.A. 2017 Supp. 21-6304(a)(3)(B) (criminal possession of a weapon by a felon); and K.S.A. 2017 Supp. 21-5111(v) ("[p]ossession" definition requiring that an item be knowingly possessed); PIK Crim. 4th 63.040 (2014 Supp.). Therefore, the giving of a culpable mental state instruction defining knowingly was legally and factually appropriate as it applies to those crimes. K.S.A. 2017 Supp. 21-5202; PIK Crim. 4th 52.010 (2015 Supp.). But Silverson correctly notes that two of the crimes charged—aggravated burglary and criminal threat—required the jury to find that he acted "with intent." Thus, it was legally improper to instruct the jury that the State was required to prove that the defendant knowingly committed *each of the crimes charged*. By doing so, the district court instructed the jury to apply a knowing culpable mental state to the specific intent crimes of aggravated burglary and criminal threat. Accordingly, the district court erred.

Because we have found error, the court must conduct a reversibility inquiry—what is commonly called the "clear error" test. An instruction is clearly erroneous when "'the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *Barber*, 302 Kan. at 377; see *Williams*, 295 Kan. 506, Syl. ¶ 8. Whether instructional error is clearly erroneous requires review of the entire record and de novo determination. The burden of showing clear error belongs to the complaining party. 295 Kan. at 516. Based on our review of the entire record, we find Silverson did not meet his burden to firmly convince this court that the verdict would have been different had the challenged jury instruction not been given. See *Barber*, 302

8

Kan. at 377; *Williams*, 295 Kan. 506, Syl. ¶ 8. We make this finding even in the absence of an additional instruction defining the term "intent" as used in both the aggravated burglary and criminal threat instructions. "[A] district court does not have to provide the jury a definition for widely used words or those readily comprehensible by individuals of common intelligence." *State v. Bolze-Sann*, 302 Kan. 198, 210, 352 P.3d 511 (2015); see *State v. Armstrong*, 299 Kan. 405, 440, 324 P.3d 1052 (2014); *State v. Roberts-Reid*, 238 Kan. 788, 789, 714 P.2d 971 (1986); *State v. Patton*, 33 Kan. App. 2d 391, 396, 102 P.3d 1195 (2004).

"Intent" is a widely used term that is readily comprehensible and needs no further defining instruction. *State v. Morehead*, No. 97,960, 2008 WL 2510576, at *5 (Kan. App. 2008) (unpublished opinion); see also *State v. Jackson*, No. 104,561, 2011 WL 4440416, at *2 (Kan. App. 2011) (unpublished opinion) ("The jury could understand the meaning of 'intentional' [a commonly used and understood word] without an instruction from the trial court."); compare Black's Law Dictionary 930 (10th ed. 2014) (defining "intent" in part as "the mental resolution or determination to do" an act) with K.S.A. 2017 Supp. 21-5202(h) ("A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result."). Giving an additional definition instruction for the culpable mental state "with the intent" would have done little if any more than the instructions given.

A reasonable juror, reading the instructions as a whole, would have looked at the aggravated burglary and criminal threat instructions in this case and seen that the State was required to prove intentional action with respect to each of those crimes, notwithstanding the more general instruction defining "knowingly." Although Silverson emphasizes that the more general instruction advises the jury that the State must prove the defendant knowingly committed *each* of the crimes charged, Silverson only cites to the first part of the sentence in that instruction. The entire sentence upon which Silverson

9

relies instructs the jury that "[t]he State must prove that the defendant knowingly committed each of the crimes charged, a*s set forth in the instructions defining the elements of those crimes*." (Emphasis added.) Reading all of the instructions together, a reasonable juror would recognize that the State was required to show that Silverson's unauthorized entry into the Kunkles' occupied home was done "with the intent to commit Criminal Threat therein." Likewise, a reasonable juror would understand that the State was required to show that Silverson made a threat to commit violence and "communicated the threat with the intent to place Ruth Kunkle and/or David Kunkle in fear." The jurors were properly instructed that each crime charged against Silverson was a separate and distinct offense and that they must decide each charge separately, and in doing so they would have seen that the aggravated burglary and criminal threat offenses stood apart from those offenses that required Silverson to act knowingly. Aggravated burglary and criminal threat required a greater showing of specific intent at the time they were committed.

Finding no clear error in the instructions, Silverson's aggravated burglary and criminal threat convictions are affirmed.

3. *Pretrial motions for new counsel*

Silverson next argues the district court erred by denying repeated motions to dismiss his appointed trial counsel, Kenneth Newton, and appoint new counsel. This court reviews a district court's refusal to appoint new counsel for an abuse of discretion—whether any reasonable person would take the view adopted by the district court. The burden is on the party alleging the abuse of discretion. *State v. Sappington*, 285 Kan. 158, 166, 169 P.3d 1096 (2007).

A defendant has a right to effective assistance of counsel during all critical stages of his or her criminal proceeding under the Sixth Amendment to the United States

10

Constitution. While the right to effective assistance of counsel does not include the right to one's counsel of choice, Kansas law recognizes that an indigent criminal defendant may demand a different appointed lawyer for good cause. See *State v. Staten*, 304 Kan. 957, 970, 377 P.3d 427 (2016).

> "To warrant substitute counsel, a defendant must show justifiable dissatisfaction with appointed counsel. Justifiable dissatisfaction sufficient to merit substitution of counsel includes a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between the attorney and the defendant." *State v. Jasper*, 269 Kan. 649, Syl. ¶ 1, 8 P.3d 708 (2000).

Upon a showing of justifiable dissatisfaction, the district court must inquire to assess the factual circumstances of the attorney-client relationship. *State v. Brown*, 300 Kan. 565, 577, 331 P.3d 797 (2014). Our Supreme Court recently articulated the three possible errors that may result from the district court's inquiry:

> "The first type of error occurs when a district court becomes aware of a potential conflict of interest but fails to conduct an inquiry. Such a failure constitutes an error of law, that is, a failure to follow the law and fulfill a legal duty. The second type of error occurs when a district court conducts an inquiry but fails to do so in an appropriate manner. An appropriate inquiry requires *fully* investigating both the basis for the defendant's dissatisfaction with counsel and the facts necessary for determining whether the dissatisfaction justifies appointing new counsel. The third type of error may occur when a district court conducts an appropriate inquiry but fails to make a decision that is reasonable in light of the facts that come to the fore. [Citation omitted.]" *Staten*, 304 Kan. at 971.

Silverson made a series of complaints about his trial counsel, each of which are summarized below.

11

a. *January 11, 2016 motion*

Silverson filed his first a pro se motion to dismiss Newton as his counsel on January 11, 2016. Silverson claimed Newton had a conflict because Newton had represented Silverson in the past and Silverson believed Newton had not been effective. Silverson asserted that if Newton was not going to be effective, he wanted Newton to withdraw. With regard to the current case, Silverson complained that Newton only had visited him one time, had not sought a bond reduction, and had not provided him pretrial discovery. Silverson also said Newton did not provide him proper notice of his preliminary hearing and that Silverson had requested, but was still waiting for, a transcript of the preliminary hearing. Finally, Silverson expressed concern that Newton was "in cahoots" with the State and was going to "railroad" him to prison without a fair trial.

At the January 29, 2016 hearing on this particular motion, Silverson accused the public defender's office of "work[ing] with" the district attorney's office to allege "trumped up" charges against him. Silverson insisted on his innocence and reiterated the arguments made in his motion. After specific questions by the court, however, Silverson ultimately withdrew his motion to dismiss Newton, stating that "if the man's gonna do his job then I will keep him." With Silverson's agreement, the district court denied the motion. In so doing, the court stated Silverson had failed to establish the justifiable dissatisfaction needed to merit substitution of counsel.

b. *June 7, 2016 motion*

On June 7, 2016, Silverson filed another pro se motion to dismiss Newton, again alleging ineffective assistance of counsel. Silverson claimed Newton did not adequately prepare him for trial, failed to request the preliminary hearing transcript, denied him access to discovery, refused to obtain a private investigator and expert witnesses as

requested by Silverson, and continued the trial setting several times against Silverson's wishes. Silverson asserted he had trust issues with Newton and questioned the merits of the evidence against him.

At the June 17, 2016 hearing scheduled by the court to hear argument on this motion, Silverson repeated that he was innocent. Silverson again complained that Newton was "railroading" him and that he still did not have his preliminary hearing transcript. Notwithstanding these claims, Silverson then advised the court that "God told [him] a message" to keep Newton as his attorney, and stated, "I want to keep Newton and hope that he does the best that he can do to fight." After confirming that Silverson wanted to withdraw his motion, the district court concluded the hearing.

c. *June 27, 2016 motion*

Trial was set to begin on June 27, 2016. That morning, Silverson again moved to dismiss Newton as his counsel on grounds that Newton was not adequately prepared for trial. Silverson also accused Newton of withholding evidence, including a tape of the 911 call, and trying to "throw [him] up under the bus." Silverson asked for a continuance to obtain new counsel and for a transcript of the preliminary hearing, which he insisted would demonstrate his innocence.

With regard to the preliminary hearing transcript, Newton explained to the district court that Silverson indicated he wanted to exercise his speedy trial rights and planned to object to any further continuances. Because of the short turnaround between arraignment and the trial date, Newton had not yet been able to obtain the preliminary hearing transcript. Newton explained the policy of his office was to make sure a case was going to trial before ordering a transcript. Newton believed the trial, if there was one, would be set for a much later date. Newton provided and reviewed the discovery produced in the case with Silverson. Newton recently received the 911 tape and played it for Silverson as

13

soon as it was received. Newton admitted that there was a delay with setting the trial because the investigator for the public defender's office had quit unexpectedly and the office had to hire a new one, which took some time.

After hearing argument from both Silverson and Newton, the district court denied the motion, finding there was no justifiable dissatisfaction and no irreconcilable conflict or a breakdown in communication. Silverson offered to waive his speedy trial rights to get a continuance for Newton to prepare for trial. The district court granted a continuance for Newton to obtain the preliminary hearing transcript.

d. *August 8, 2016 motion*

Silverson filed another motion to remove Newton as his counsel on August 8, 2016, claiming that Newton had failed to adequately prepare a defense. Specifically, Silverson claimed Newton abandoned him, failed to research and investigate Silverson's claims, failed to advise him on the law applicable to his case, and denied him the right to assist in making his defense. Silverson insisted he was innocent and was unable to "fight this case" because he was not receiving competent and meaningful representation.

On August 19, 2016, the district court held a hearing on Silverson's motion. At the hearing, Silverson argued that, although he had received his preliminary hearing transcript, he believed it had been edited. The court conducted the following inquiry before ultimately denying the motion:

> "THE COURT: So your purpose today really isn't to ask me to fire Mr. Newton as your lawyer. Your purpose is to let me know that you think that the preliminary hearing transcripts are not accurate and that prosecutorial misconduct has occurred.
> "[SILVERSON]: Yeah. I know that happened. I can prove it.
> "THE COURT: Well, if that's the purpose, then, a notification has been made, but I don't see that that has much to do with Mr. Newton's representation of you. I mean,

14

those are issues that you may have with the court reporter or issues that you may have with the prosecutor, but those issues are completely outside of Mr. Newton's control. He can't—he's not personally responsible for preparation of the transcript. That's between you and the court reporter. And to the extent that something needs to be done about that, the remedy isn't to terminate Mr. Newton as your lawyer.

"So for those reasons the Court will deny the motion."

e. *October 25, 2016 issues with counsel*

Silverson's jury trial began on October 24, 2016. On the morning of the second day of trial, before the jury was seated and opening statements were presented, the district judge addressed Silverson. The judge noted that Silverson previously had filed motions to dismiss Newton as his counsel, which had been denied. The judge put Silverson "on notice" that the court did "not tolerate disruptive, obstructionist conduct by any defendant in any case."

Silverson then asked to address the court. After insisting that the evidence in the case demonstrated his innocence, Silverson told the judge that he was "just letting [the judge] know in the court just in case [Newton] doesn't effectively do his job and they taint a conviction and they find me guilty, that is an injustice." The district judge told Silverson: "Mr. Newton is your attorney. There's been issues previously raised with regard to ineffective assistance of counsel. Mr. Newton was allowed to remain on the case. I am not going to change that ruling at this point."

On appeal, Silverson contends the district court erred in denying all of his motions to dismiss Newton as his attorney because his relationship with Newton had deteriorated so substantially that it resulted in an irreconcilable conflict or a complete breakdown in communication. In addressing this issue on appeal, we note that Silverson made repeated complaints about Newton's representation but the district judge only denied two motions to dismiss Newton and appoint new counsel: the one filed on June 27, 2016, and the one

15

filed on August 8, 2016. Silverson withdrew his January 11, 2016 and June 7, 2016 motions, so he may not complain about error in the district court's decision. We do not consider Silverson's comments before trial on October 25, 2016, to be an oral motion for new counsel.

When a defendant alleges ineffective assistance of counsel, the district court must conduct an investigation. Silverson acknowledges that the court addressed his concerns at the motion hearings, but he contends that the court's questions were "cursory" and did not "delve[] deeper into the actual attorney-client relationship or its breakdown." Here, the court fully heard Silverson's complaints set forth in the June 27, 2016 and August 8, 2016 motions. The court gave Silverson the opportunity to present his motions and fully express the basis of his dissatisfaction with his counsel at the hearings. "A court is not required to engage in a detailed examination of every nuance of a defendant's claim of inadequacy of defense and conflict of interest. A single, open-ended question by the trial court may suffice if it provides the defendant with the opportunity to explain a conflict of interest, an irreconcilable disagreement, or an inability to communicate with counsel." *Staten*, 304 Kan. at 972-73.

Silverson also argues that he had a "sour relationship" with Newton due to "bad blood" between them in the past. But on review, this court focuses on whether the attorney provided appropriate representation in the adversarial process, not on the relationship between attorney and client. *State v. Pfannenstiel*, 302 Kan. 747, 761-62, 357 P.3d 877 (2015). "[U]ltimately, as long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel." *State v. Bryant*, 285 Kan. 970, Syl. ¶ 14, 179 P.3d 1122 (2008).

16

Silverson asserts he consistently complained about a breakdown in his relationship with Newton. On appeal, however, Silverson only specifically complains that Newton "delayed [his] case" by waiting until six months after the preliminary hearing to seek the transcript, and Newton asked for the 911 tape "late." Silverson fails to explain how those issues demonstrated a breakdown in communication. And even so, the court fully explored those concerns at the hearing on Silverson's June 27, 2016 motion by having Newton respond to them on the record. Newton explained that he had not yet obtained the preliminary transcript for two reasons: There was a short turnaround when Silverson relied on his right to a speedy trial to object to further continuances, and the policy in his office was to wait to order the transcript until a trial date was set. In response, Silverson agreed to waive his right to a speedy trial and requested a continuance in order for Newton to request the preliminary hearing transcript. The court granted Silverson's request for continuance. Newton also told the court that he requested the 911 tape as soon as he realized he did not have it and provided it to Silverson as soon as he received it.

We find the district court fully investigated Silverson's complaints and denied the motion for new counsel because there was no irreconcilable conflict or a breakdown in communication. Reasonable persons could agree with the district court's decision that the issues raised at that hearing did not rise to the level warranting new counsel; thus, the district court did not abuse its discretion in declining to appoint new counsel to represent Silverson.

4. *Posttrial motions for new counsel*

Silverson was assigned new counsel for posttrial matters because Newton left his employment with the public defender's office. Silverson's replacement counsel, Scott Anderson, also was employed by the public defender's office.

17

Anderson filed a motion for a new trial and judgment of acquittal on Silverson's behalf. The next day, Silverson filed his own pro se motion for mistrial, which included claims that Newton provided ineffective assistance as his trial counsel. Silverson also filed a motion to dismiss Anderson as his counsel, claiming a conflict of interest. Specifically, Silverson claimed that he asked Anderson to amend his motion for a new trial to include claims of ineffectiveness of trial counsel. According to Silverson, Anderson refused because Newton was a former member of the public defenders' office, and there was an "unwritten brotherhood" policy against attacking other public defenders.

The district court heard Silverson's posttrial motions prior to sentencing. With regard to Silverson's motion to dismiss Anderson as his counsel, Anderson explained an attorney with the public defender's office does not bring ineffective assistance of counsel claims against other attorneys who work, or have worked, for the office because it creates a conflict of interest. Rather, the public defender's office hires outside counsel to pursue such claims. Notwithstanding this explanation, the court denied Silverson's motion to dismiss Anderson as counsel and for appointment of conflict-free counsel because Silverson failed to establish he had any sort of conflict with Anderson. The court noted that Silverson's allegations regarding Newton's ineffective assistance were moot and "has nothing to do with the case" because Newton was no longer representing Silverson.

On appeal, Silverson claims the district court erred in denying his motion because he established a clear conflict of interest existed if Anderson continued to represent him: Silverson wanted to pursue a claim of ineffective assistance of counsel against Newton, but Anderson could not represent him in that claim because the public defender's office has a conflict in asserting such a claim against itself. The State concedes error on this point.

Silverson was denied the right to conflict-free representation with regard to his posttrial matters. Therefore, we remand with directions for the district court to appoint

18

new counsel to represent Silverson in his motion for new trial, including claims of ineffective assistance of trial counsel.

5. *Cumulative error*

Silverson argues the cumulative effect of the district court's errors was so prejudicial as to warrant a new trial. When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all errors and, even of those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. *State v. King*, 297 Kan. 955, 986, 305 P.3d 641 (2013).

A single error cannot constitute cumulative error. *State v. Frierson*, 298 Kan. 1005, 1020, 319 P.3d 515 (2014); *State v. Stafford*, 296 Kan. 25, 60, 290 P.3d 562 (2012). Here, Silverson has only shown that one trial error occurred, and that trial error was not clearly erroneous. Accordingly, the cumulative error doctrine is inapplicable.

6. *KORA*

The district court ordered Silverson to register as a violent offender under KORA because it found he used a deadly weapon to commit the offenses of which he was convicted. Silverson argues that the registration requirement unlawfully increased his punishment based upon improper judicial fact-finding in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (any fact necessary to increase punishment for offense other than prior conviction must be established by guilty plea or proved beyond reasonable doubt to jury).

"'Whether a defendant's constitutional rights as described under *Apprendi* were violated by a district court at sentencing raises a question of law subject to unlimited

19

review.'" *State v. Huey*, 306 Kan. 1005, 1009, 399 P.3d 211 (2017), *cert. denied* June 25, 2018 (quoting *State v. Dickey*, 301 Kan. 1018, 1036, 350 P.3d 1054 [2015]).

The Kansas Supreme Court previously has rejected this claim, holding that the registration requirement under KORA is not "punishment." Thus, the district court's deadly weapon finding does not violate *Apprendi* by increasing the punishment for an offense. *Huey*, 306 Kan. at 1010. In *Huey*, the Kansas Supreme Court held:

"The legislature intended KORA to be civil and nonpunitive for all classes of offenders currently subject to its provisions. See [*State v.*] *Meredith*, 306 Kan. [906, 911], 399 P.3d 859 [(2017)], see also *State v. Myers*, 260 Kan. 669, 696, 923 P.2d 1024 (1996) ('We hold that KSORA's registration requirement does not impose punishment; thus our ex post facto inquiry as to registration ends.'), *cert. denied* 521 U.S. 1118 (1997). Only the clearest proof that the scheme is ""'so punitive either in purpose or effect as to negate the [legislature's] intention""' will suffice to override the legislature's nonpunitive intent and transform what has been denominated a civil remedy into a criminal penalty. *Meredith*, 306 Kan. at 911 (quoting *Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d 164 [2003]). We hold Huey has failed to make that showing.

"Because Huey raised his *Apprendi* challenge for the first time on appeal, he offered no evidence and the district court made no findings. Consequently, Huey offers no fact-based arguments on the factors we must consider in determining whether the Act's effects render it punitive as applied to violent offenders. See *Meredith*, 306 Kan. at 913 ('[A]nalysis of the [*Kennedy v.*] *Mendoza-Martinez*[, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963),] factors requires a robust record because the effects prong of the applicable legal test obliges an appellate court to premise its legal conclusion on at least some fact-intensive questions—*i.e.*, the legitimacy of the public safety interests at stake, the effectiveness of the alternative purpose to promote public safety, etc.').

"Without a record, we cannot conclude the effects of KORA's registration requirements as to violent offenders are so punitive as to override the legislature's intent that KORA be a civil remedy. Therefore, Huey has not demonstrated, as he must, that the registration requirements constitute punishment. Because the registration requirements did not increase Huey's punishment under the law of this case, it was not necessary that

20

Huey's use of a deadly weapon be found beyond a reasonable doubt by a jury." 306 Kan. at 1009-10.

Like in *Huey*, Silverson raised his claim for the first time on appeal, and so there is no evidentiary record that this court can review to determine whether the "clearest proof" can overcome the Legislature's intent that KORA is nonpunitive. In fact, Silverson did not advance any evidence upon which this court could rely to find that registering under KORA would be punitive in this case. Silverson asks this court to remand so that the district court can make those factual findings. *Huey* forecloses this option. 306 Kan. at 1009-10; see also *State v. Watkins*, 306 Kan. 1093, 1095, 401 P.3d 607 (2017) ("Without a factual record, we cannot conclude that KORA's registration requirements as to violent offenders are so punitive as to override the legislature's intent that KORA be a civil remedy."). But we are duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). Accordingly, we find the district court did not violate Silverson's constitutional rights by requiring Silverson to register under KORA.

Affirmed in part, reversed in part, and remanded for further proceedings.

21