NOT DESIGNATED FOR PUBLICATION

No. 117,409

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHAWN R. COLLINS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed October 26, 2018.
Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*,
attorney general, for appellee.

Before BRUNS, P.J., MCANANY, J., and BURGESS, S.J.

PER CURIAM:  A jury convicted Shawn R. Collins of voluntary manslaughter and criminal possession of a weapon by a convicted felon. Initially, the State charged Collins with second-degree murder, aggravated assault, and possession of a weapon by a convicted felon. Prior to trial, Collins claimed self-defense immunity under K.S.A. 2015 Supp. 21-5231. After an evidentiary hearing, the district court denied Collins' motion for immunity and the case proceeded to trial. At trial, the State dismissed the aggravated assault charge. Ultimately, the jury convicted Collins of the lesser included offense of voluntary manslaughter and of criminal possession of a weapon by a convicted felon.

1

On appeal, Collins does not challenge his conviction on the weapons charge. Instead, Collins contends that the district court erred by denying him self-defense immunity and by improperly instructing the jury. He also contends that the State committed prosecutorial error during closing argument. Finally, Collins contends that the jury's verdict should be set aside based on cumulative error. Because we do not find Collin's arguments to be persuasive, we affirm his convictions.

FACTS

On January 23, 2016, police officers found the body of Daniel Thompson setting in a living room chair at a house located on South St. Francis Street in Wichita. A red curtain covered Thompson's body. When the officers removed the curtain, it became apparent that someone shot Thompson in the torso. Although he had a knife in a sheath on his belt and a leather slapper in his pocket, there were no weapons in his hands, on his lap, in the chair, or on the floor.

An autopsy later revealed that Thompson died as a result of a single gunshot wound to his lower chest. The autopsy report indicated a handgun fired the bullet that killed Thompson. The autopsy report also indicated that the shot was taken from an indeterminate distance greater than approximately three feet and that the bullet travelled at a slightly downward trajectory before striking Thompson.

In 2014, Thompson and Tina Sauer had lived in the house in which police found Thompson's body. While the record is not clear on the timing of events, Collins stipulated that Thompson was on the lease when he died. At the time, Thompson and Sauer had been in a relationship for around eight years. In fact, Sauer considered Thompson to be her common law husband. Moreover, Thompson and Sauer were raising four children together during their relationship. While the two oldest children had different fathers, Thompson was the biological father of Sauer's third child, and may have been the father

2

of the youngest child. At the time of Thompson's death, the youngest child was 11 months old.

It is unclear when the relationship between Thompson and Sauer ended. However, it is undisputed that Sauer began a relationship with Shawn Collins during the summer of 2015. Like Thompson, Collins had also been in and out of jail on multiple occasions. At the time Sauer and Collins began their relationship, Thompson was in a residential treatment facility but continued to visit the children. According to Collins, the two men did not have any problems during those visits.

The record reflects that Thompson returned to jail from September 9 to December 23, 2015. Likewise, Collins returned to jail from November 25, 2015, to January 19, 2016. Upon release from jail in December 2015, Thompson moved back into the house on South St. Francis Street with Sauer and the children. It is unclear from the record when—or if—Thompson actually moved his belongings out of the house.

Although the State released Collins from jail on January 19, 2016, he was arrested again two days later and once again returned to the Sedgwick County Jail. As part of the investigation into Thompson's death, police officers listened to multiple recorded phone calls that Collins made to Sauer from the jail before police located Thompson's body. In one of the phone calls, Collins told Sauer that he had "fucked up" and "wished [he] didn't do what [he] just did." In another phone call, Collins told Sauer not to go back to the house "till things are good," and the two discussed the need for Sauer to get a big box in order to move something.

After finding Thompson's body, police officers separately spoke to Collins and Sauer. During his interview, Collins denied shooting Thompson. Collins also told police that he and Sauer did not stop by the house on the night of the shooting because they saw someone on the porch. When officers spoke to Sauer, she also initially denied any

3

knowledge of Thompson's death. However, after investigators confronted her with recordings from the phone calls that Collins made to her from the jail, Sauer told the officers that Collins had shot Thompson. Although she would later deny it, Sauer also told the police that she had covered Thompson's body with the curtain two days after he had been killed.

On January 26, 2016, the State charged Collins with second-degree murder and aggravated assault. Because Collins had been convicted of burglary of a non-residence in 2008, the State also charged him with criminal possession of a weapon by a convicted felon. On September 2, 2016, Collins filed a motion to dismiss the charges filed against him based on a claim of immunity from prosecution under K.S.A. 2015 Supp. 21-5231. Specifically, Collins asserted that he reasonably believed that the use of lethal force was necessary to defend himself from Thompson.

On September 23, 2016, the district court held an evidentiary hearing to consider—among other things—Collin's motion to dismiss. At the hearing, both Sauer and Collins testified. In addition, the State offered the testimony of Detective Robert Chisholm of the Wichita Police Department. The State also admitted six exhibits into evidence, including photos of the crime scene and a recording of Detective Chisholm's interview of Collins.

Although Sauer's testimony was at times confusing and difficult to follow, she testified regarding her relationships with Thompson and Collins. Sauer confirmed that she viewed Thompson to be her common law husband but indicated that she "was gonna get a divorce" at some unknown point in the future. Sauer recognized that "at one time" Thompson's name was on the rental agreement for the house and indicated that he had kept "his belongings" there until "a couple of nights before he was deceased."

4

Sauer admitted that upon Thompson's release from jail in December 2015, he had moved back into the house with her and the children. At the time, Collins remained incarcerated. Sauer claimed that she wanted Thompson out of the house so she could resume her relationship with Collins upon his release from jail. According to Sauer, Thompson became upset when she told him this and would not accept the fact that she was in love with Collins. Sauer also claimed that Thompson threatened to stab or shoot Collins. Sauer testified that she told Collins about the threats the day before the State released him from jail.

Sauer testified that she picked Collins up from the jail on the afternoon of January 19, 2016. The two returned to the South St. Francis Street house and Thompson was there with the children. According to Sauer, she and Collins went into a bedroom to have sex while Thompson was in the living room with the children. She indicated that after they were finished having sex, the couple opened the bedroom door and Thompson came in with the children. Sauer claims that Thompson told Collins "you ain't ever gonna be with her" and "nothing against you, Shawn, but you ain't gonna be with her . . . ." However, Sauer testified that the argument did not become physical.

Sauer asserted that Collins left the house and Thompson kicked an ottoman at her when she attempted to go after him. At some point, Thompson also left and Sauer went to pick up Collins at his friend's house. That night, the two spent the night at a motel with Sauer's youngest child. Sauer testified that the next day she and Collins returned to the house in the early afternoon to pick up some clothes for the children. According to Sauer, a window screen was missing and she called the police because she was afraid that Thompson was in the house. Although the responding officers did not find anyone there, they told Sauer and Collins that they could call them if there were any more problems.

Although Sauer claims that she never saw Collins with a gun, she believes he had one with him when the two returned to the house shortly after midnight on January 21,

5

2016. Collins had also borrowed a motion detector from a friend. Sauer testified that when they arrived at the house, a man she knew as J.J. was on the small front porch. While sitting in a van in the driveway, Sauer purportedly asked J.J. to come into the house to "smoke a bowl" of marijuana and he hesitated. Evidently, this made both her and Collins suspicious that Thompson may be there. According to Sauer, "we weren't going to let 'em just scare us out of our house." She also testified that they did not call the police because "we had protection" and "didn't feel so scared."

Sauer recalled that Collins was carrying her youngest child in a baby carrier as he approached the front door. She also recalled that she was "getting' ready to get out of the van" when Collins sat the baby carrier down and entered the house. Sauer claims that as she approached the house she could see inside because "all the lights were on" and the front door was wide open. According to Sauer, Collins "walk[ed] back and check[ed] the bedrooms and then [came] back from the hallway . . . and then I heard a gunshot and I ran inside." Sauer does not recall hearing an argument, fight, or other disturbance prior to hearing the gunshot.

Sauer testified that in the house she saw Thompson "sitting in front of the chair" in the living room directly to the left of the front door. Sauer also testified that Thompson was "holdin' his heart" and heard his "last breath sound." According to Sauer, after she saw Thompson die, Collins grabbed her and pulled her out of the front door of the house. They then went to the house of one of Collins' friends to spend the night. Sauer admitted that at no time did they call the police to report the shooting.

Sauer testified that later on the morning of January 21, 2016, Collins went to traffic court and was arrested on charges unrelated to this appeal. Sauer also testified that she went back to the house to "put my dog downstairs." She admitted that she talked to Collins while he was in jail about getting rid of "a whole bunch of junk" in the house and having to get a big box. Sauer's claimed that this was related to her moving out of the

6

house and was not related to moving Thompson's body. Although her testimony was unclear regarding whether she had covered up the body on the day it was discovered, she did admit that she and the children had gone by the house that day and she did not want them to see Thompson's dead body.

Detective Chisholm testified that police officers found Thompson's body on January 23, 2016, sitting in a chair and covered by a red curtain. According to Chisholm, when he interviewed Sauer later that day, she told him that "[s]he had covered him up with a curtain" because "[s]he didn't want to keep looking at him. . . ." Chisholm also testified that Thompson did not have anything in his hands.

Chisholm indicated that Sauer told him she had to look through Thompson's pockets after he died for an identification card but she could not look in his back pockets because he was sitting on them. Chisholm also indicated that Thompson had "an old style leather sap . . . some people call it a slapper" in one of his back pockets. In addition, Chisholm testified that Thompson had a knife in a sheath on his belt.

In addition, Chisholm testified regarding the recordings of the calls between Collins and Sauer made when he was in jail and prior to the discovery of Thompson's body. According to Chisholm, Collins and Sauer discussed "that they need a really big box for that one thing." Although Collins gave no justification for his action, Chisholm testified that Collins told Sauer "that he wish[ed] he didn't do what I just did, he says I fucked up there." Collins also discussed with Sauer that "she can't go back to the house" and that he needed to be "bonded out to help or finding other people to help her."

Collins testified that his relationship with Sauer began in May or June 2015 and that he moved into the house on South St. Francis Street in July 2015. Although Thompson was in a residential treatment facility, he would come to the house to see the children. According to Collins, he and Thompson never had any problems during these

7

visits even though Thompson knew about the nature of his relationship with Sauer. Collins remained in the house until he was arrested and placed in jail shortly before Thanksgiving 2015. During a jail visit, Sauer told Collins that Thompson had moved back into the house following his release from jail a few days before Christmas 2015.

Regarding the events on the afternoon of January 19, 2016, Collins recalled that Sauer picked him up from jail and took him to the house. Upon arriving, the children told Collins and Sauer that Thompson was there. Collin's recollection regarding the events that occurred once they were in the house differed from Sauer's recollection. He recalled that Sauer took him into the bedroom to show him pictures on the wall. According to Collins, Sauer yelled to Thompson to ask about some of the pictures and he came into the bedroom. Collins indicated that Thompson told Sauer that "it's going to be me or him, and he didn't have no place to go so he wasn't going nowhere."

Although there was no physical altercation, Collins testified that he told Thompson that Sauer "had a choice to who she was going to be with" and Thompson became upset. Specifically, Collins testified that Thompson "started coming at me, and the kids and [Sauer] jumped in front of him." According to Collins, he "sidestepped [Thompson] and left the house." Evidently, Collins walked to a friend's house and Sauer came to pick him up about an hour later. That night, Collins, Sauer, and the children stayed at a motel.

Collins claimed that he did not feel comfortable staying at the house because Sauer had told him during a visit to the jail that Thompson had "threatened to shoot me or stab me." Collins testified that the following day, Sauer and he dropped the three older children at their grandmother's house while the baby stayed with them. He also testified that he and Sauer went back to the house on South St. Francis Street but noticed a screen plate of a window missing. As such, they called the police who searched the house and

8

found nobody there. Collins admitted that the police told them to call if they had any further problems.

Collins testified that he, Sauer, and the baby returned to the house shortly after midnight on the morning of January 21, 2016. On the way, Collins stopped to pick up a motion detector from a friend. Collins testified that at some earlier time in the day he picked up a gun "[f]or safety" from another friend. Specifically, Collins claimed that he got the gun "[b]ecause I . . . feared that [Thompson] was either going to stab me or shoot me." Notwithstanding, Collins stated that he returned to the house because he "had no place else to go." Although Collins admitted that his name was not on the lease, he claimed that it was his home.

Collins testified that when he pulled Sauer's van into the driveway of the house, he noticed a man on the front porch. Collins admitted that when he got out of the van he had the handgun drawn but indicated that it was "pointed at the ground." Collins recalled that Sauer was sitting in the front passenger seat of the van and she indicated that she knew the man. At that point, the man and Sauer started to talk. Collins also recalled getting back into the van and Sauer told him that the man was one of her friends.

According to Collins, he decided at that point to go into the house. From this point, Collins testimony was substantially different from the testimony offered at the hearing by Sauer. In particular, Collins testified that he was not carrying the baby when he approached the house. Collins also testified that he did not search the house prior to shooting Thompson. Although Sauer had testified that the lights in the house were on and that she could see inside, Collins claimed that he shot "in the dark" and that there was "only a little light on."

9

Specifically, Collins testified as follows:

"Q. What happens when you open the door?

"A. I stepped in, made five, six steps, and [Thompson] came out—well, he was sitting down in the chair and he came up out of the corner and he raised his arm up and I just pulled the pistol and shot him.

"Q. Were any words exchanged?

"A. He just said, hey, mother fucker, and all I seen was his hand coming up.

"Q. Did you understand and realize that it was [Thompson]?

"A. No.

"Q. What did you think was in his hand?

"A. A weapon.

"Q. And why would you think that?

"A. Because prior, the kids and everything saying that he was going to stab or shoot me."

Collins testified that after he fired the shot, he "took off running" and did not stick around to check on Thompson. He further testified that he dropped the gun as he ran out of the house, that he grabbed Sauer who "was screaming on the front porch," and fled the scene in the van. He claimed that the gun fell out of his hoodie pocket and he had no idea what happened to the gun after that night. Collins admitted that neither he nor Sauer called the police because he was in fear "[o]f what the outcome was going to be. . . ."

10

At the conclusion of the hearing, the district ruled that Collins was not entitled to immunity from prosecution.

A five-day jury trial commenced on November 28, 2016. At trial, the State dismissed the aggravated assault charge. In addition to the second-degree murder charge, the district court also instructed the jury on the lesser includible offenses of voluntary and involuntary manslaughter. After deliberation, the jury ultimately convicted Collins of the lesser included offense of voluntary manslaughter. In addition, the jury convicted Collins of criminal possession of a weapon by a convicted felon.

The district court subsequently sentenced Collins to 107 months—plus 36 months of postrelease supervision—on the voluntary manslaughter charge and to a consecutive sentence of 9 months on the criminal possession of a weapon charge. The district court further ordered Collins sentences in this case to run consecutive to the sentences he is serving in three other cases. Finally, the district court ordered him to pay $5,000 in restitution to the Crime Victim's Compensation Board.

ANALYSIS

*Immunity from Prosecution*

On appeal, Collins initially contends that the district court erred when it determined he was not entitled to immunity from prosecution pursuant to K.S.A. 2015 Supp. 21-5231. At oral argument, Collins' counsel confirmed that he is not challenging the factual findings made by the district court. Instead, Collins is challenging the legal conclusion that the State established probable cause that his use of force was not statutorily justified. In response, the State contends that it came forward with sufficient evidence at the hearing on the immunity motion to establish probable cause that Collins' use of force was not statutorily justified.

11

In 2010, the Kansas Legislature enacted a series of statutes addressing the use of force—including the use of deadly force—in the defense of a person or property. See K.S.A. 2015 Supp. 21-5220 et seq. These statutes are often collectively referred to as the Kansas "stand-your-ground" law. Before we discuss the merits of this issue, we will briefly review the applicable statutes.

K.S.A. 2015 Supp. 21-5222 states:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

However, under K.S.A. 2015 Supp. 21-5226, the justification described in K.S.A. 2015 Supp. 21-5222(b) is *not* available to one who:

"(a) Is attempting to commit, committing or escaping from the commission of a forcible felony;

"(b) initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or

"(c) otherwise initially provokes the use of any force against such person or another, unless:

12

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force."

Furthermore, K.S.A. 2015 Supp. 21-5230 states:

"A person who is not engaged in an unlawful activity and who is attacked in a place where such person has a right to be has no duty to retreat and has the right to stand such person's ground and use any force which such person would be justified in using under article 32 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or K.S.A. 2015 Supp. 21-5202 through 21-5208, 21-5210 through 21-5212, and 21-5220 through 21-5231, and amendments thereto."

Finally, K.S.A. 2015 Supp. 21-5231 provides:

"(a) A person who uses force which, subject to the provisions of K.S.A. 2015 Supp. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 2015 Supp. 21-5222 . . . , and amendments thereto, is immune from criminal prosecution . . . for the use of such force . . . .

"(b) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (a), but the agency shall not arrest the person for using force unless it determines that there is probable cause for the arrest.

"(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause."

In *State v. Ultreras*, 296 Kan. 828, 845, 295 P.3d 1020 (2013), the Kansas Supreme Court determined that the standard of proof for whether a defendant is entitled

13

to immunity from criminal prosecution is probable cause. Moreover, the State bears the burden of establishing proof that the force used by a defendant was not justified as part of the probable cause determination under the immunity statute. 296 Kan. at 845. In other words, the State bears the burden of establishing *probable cause* that a defendant's use of force was *not* statutorily justified.

In *State v. Hardy*, 305 Kan. 1001, Syl. ¶ 1, 390 P.3d 30 (2017), the Kansas Supreme Court clarified the role of the district court in deciding a motion for immunity from prosecution, stating:

> "Upon a motion for immunity . . . , the district court must consider the *totality of the circumstances*, weigh the evidence before it *without deference to the State*, and determine whether the State has carried its burden *to establish probable cause* that the defendant's use of force *was not statutorily justified*." (Emphases added.) 305 Kan. 1001, Syl. ¶ 1.

Our Supreme Court also set forth the applicable standard of review on appeal, stating:

> "An appellate court will apply a bifurcated standard of review to a district court's determination of probable cause pursuant to K.S.A. 2016 Supp. 21-5231. When a district court's ruling entails factual findings arising out of disputed evidence, a reviewing court will not reweigh the evidence and will review those factual findings for supporting substantial competent evidence only. The ultimate legal conclusion drawn from those facts is reviewed de novo. When there are no disputed material facts, a pure question of law is presented over which an appellate court exercises unlimited review." 305 Kan. 1001, Syl. ¶ 5.

We pause to note that the district court did not have the benefit of the *Hardy* decision when ruling on Collins' immunity motion. The record reflects that the district court held the evidentiary hearing on the motion on September 23, 2016, and that our

Supreme Court issued the *Hardy* opinion on March 10, 2017. As indicated above, Collins does not challenge the factual findings of the district court. As such, we are presented with a legal issue over which we have unlimited review. In conducting our review, we will apply the standard set forth in *Hardy* and consider the totality of the circumstances—without deference to the State—to determine whether the State has carried its burden to establish probable cause that Collins' use of force was not statutorily justified.

Our Supreme Court has defined probable cause to mean "evidence sufficient for a person of 'ordinary prudence and caution to conscientiously entertain a reasonable belief' of [the defendant's] guilt despite his claim of justified use-of-force immunity." *Ultreras*, 296 Kan. at 846. Here, it is undisputed that Collins used deadly force against Thompson. As indicated above, K.S.A. 2015 Supp. 21-5222(b) provides that "deadly force can be justified only to the extent a person reasonably believes the 'use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." *State v. Seba*, 305 Kan. 185, 209, 380 P.3d 209 (2016).

Based on our review of the transcript from the immunity hearing, we find no evidence to suggest that Collins was under threat of imminent death or great bodily harm at the time he shot Thompson. At most, the evidence presented at the immunity hearing suggests that Thompson may have told Sauer that he wanted to shoot or stab Collins at some unknown point in the past. These statements were allegedly made while Collins was in the Sedgwick County Jail and were allegedly relayed to him by Sauer during a visit to the jail. We note from the record that Collins was incarcerated from November 23, 2015, to January 19, 2016. There is no evidence in the record to suggest that Thompson threatened to shoot or stab Collins after he was released from jail.

The district court found that Thompson had a right to be in the house on South St. Francis Street at the time Collins shot him in the early morning hours of January 21, 2016. Moreover, Collins does not dispute this finding. Although Collins referred to the

15

house as "his home" during his testimony at the immunity hearing, there is no evidence in the record that he signed the lease. Moreover, the evidence shows that he had not stayed in the house since his arrest in November 2015. Nevertheless, it appears from the evidence that Collins also had a right to be in the house as Sauer's guest.

Turning to the shooting itself, the evidence presented at the immunity hearing indicated that Thompson was either sitting in or starting to get out of a chair several feet away from Collins at the time Collins fired. Specifically, Collins testified that he took five or six steps into the house and "Daniel [Thompson] came out—well, he was sitting down in the chair and he came up out of the corner and he raised his arm up and I just pulled the pistol and shot him." Collins also testified that Thompson called him a derogatory name.

It was later determined that Thompson had a leather slapper in his back pocket and a knife in a sheath on his belt. However, there is no evidence that Thompson had a weapon or anything else in his hands when Collins shot him. Significantly, although Collins testified that he thought Thompson had a weapon in his hand, he admitted later in his testimony at the hearing that Thompson did not point any weapons at him.

Furthermore, both Sauer and Collins testified that they did not call the police when they saw a man standing on the front porch—or about their concern that Thompson may be in the house—even though they had called the police the previous afternoon when they thought someone might be in the house. Instead, as Collins admitted in his testimony, he got out of the van with a gun drawn to approach the man on the porch and it is undisputed that he still had the gun in his possession when he entered the house. Of course, as a convicted felon, Collins did not have a legal right to possess a firearm.

During his testimony at the hearing, Collins initially said that "Daniel [Thompson] . . . was sitting down in the chair and . . . he raised his arm up and I just pulled the pistol

16

and shot him." Later, he testified that he did not know who the person was or even if he actually shot the person. Interestingly, Sauer testified that the lights in the house were on at the time of the shooting and that she could see Collins walking through the house prior to the shooting. However, Collins testified that there was "only a little light on" and that he shot "in the dark" after taking a few steps into the house.

Collins testified that after the shooting, he "took off running." Again, Sauer and Collins offered inconsistent testimony regarding what happened next. However, Collins claims that he "dropped the gun when I came off the front porch" but he has no idea what happened to it after that point. According to Collins, he did not pick up the gun because he wanted to "get out of that vicinity." Although Collins indicated he still felt he might be in danger, neither he nor Sauer called the police. Instead, they went to the house of one of Collins' friends and spent the night.

The evidence presented by the State indicated that police officers found Thompson's body sitting in a chair covered with a red curtain on January 23, 2016. By that time, Collins had returned to jail on unrelated charges. Even when initially interviewed by the police after the body was found, Collins did not admit that he shot Thompson or that he did so in self-defense. Rather, Collins only admitted his involvement after Sauer told police about his involvement after police confronted her with recordings of phone calls that Collins made to her from the jail including a discussion about finding a large box to move something out of the house.

Although Collins does not challenge the district court's findings of fact, based on our review of the record we find them to be both reasonable and supported by substantial competent evidence. Turning to the legal question presented, we find based on the totality of the circumstances that the State has met its burden to establish probable cause that Collins was not entitled to immunity from prosecution for his use of deadly force against

17

Thompson. We, therefore, conclude that the district court appropriately allowed the claims and defenses asserted by the parties to proceed to trial.

*Jury Instructions*

Collins also contends that the district court erred in instructing the jury. First, he argues that the district court failed to properly instruct the jury on the lesser included offense of involuntary manslaughter. Second, he argues that the district court erred by failing to instruct the jury that the State was required to prove beyond a reasonable doubt that Collins did not act in self-defense. In response, the State contends that the involuntary manslaughter instruction was not clearly erroneous. The State also contends that Collins invited any error regarding the self-defense instruction.

Regarding the involuntary manslaughter instruction, Collins concedes that he failed to object at trial. As such, we will reverse the district court only if it committed clear error. *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016).We utilize a two-step process in determining whether a challenged instruction was clearly erroneous. First, we determine whether there was any error at all by considering whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record. Second, if we find error, we turn to the question of "'whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). The party claiming error in the instructions—in this case Collins—has the burden to prove the degree of prejudice necessary for reversal. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

Here, we find that the district court's instructions on involuntary manslaughter and on self-defense were both factually and legally appropriate. In fact, Collins concedes in his brief that the instructions were factually appropriate. Instead, Collins argues that the

instructions were not legally appropriate because they did not properly instruct the jury on the specific meaning of certain terms. We disagree.

Our Supreme Court "strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to [jury] instructions." *State v. Barber*, 302 Kan. 367, 377-78, 353 P.3d 1108 (2015). Absent a need under the facts of a case to modify a particular PIK instruction, they should be used by district courts. *State v. Acevedo*, 49 Kan. App. 2d 655, 663, 315 P.3d 261 (2013). Based on our review of the instructions given to the jury in this case, we find that the district court followed PIK Crim. 4th 54.180 (2016 Supp.) when instructing on involuntary manslaughter. Likewise, the district court followed PIK Crim. 4th 51.050 (2016 Supp.) and PIK Crim. 4th 52.200 (2016 Supp.) when instructing on self-defense.

K.S.A. 2015 Supp. 21-5405 provides:

"(a) Involuntary manslaughter is the killing of a human being committed:

"(1) Recklessly;

"(2) in the commission of, or attempt to commit, or flight from any felony, other than an inherently dangerous felony as defined in K.S.A. 2015 Supp. 21-5402, and amendments thereto, that is enacted for the protection of human life or safety or a misdemeanor that is enacted for the protection of human life or safety, including acts described in K.S.A. 8-1566 and subsection (a) of 8-1568, and amendments thereto, but excluding the acts described in K.S.A. 8-1567, and amendments thereto;

"(3) in the commission of, or attempt to commit, or flight from an act described in K.S.A. 8-1567, and amendments thereto; or

"(4) during the commission of a lawful act in an unlawful manner."

19

Similarly, PIK Crim. 4th 54.180—which the district court used states:

"If you do not agree that the defendant is guilty of voluntary manslaughter, you should then consider the lesser included offense of involuntary manslaughter.

"To establish this charge, each of the following claims must be proved:

"1. The defendant killed <victim>.

"2. It was done (recklessly) . . . .

"3. This act occurred on or about the ___ day of _____, _____, in _____ County, Kansas."

Because the language of the statute and pattern instruction is consistent, we find the jury instruction given to be legally appropriate. Although Collins takes issue with the instruction, he does not clarify how the district court should have instructed the jury. Instead, Collins argues that the district court should have included additional language about imperfect self-defense into the instruction. However, Collins merely speculates that the language contained in the statute and the pattern instruction may have confused the jury. We do not find such speculation to be sufficient for Collins to maintain his burden to prove that the instruction given was clearly erroneous.

Furthermore, our Supreme Court has held that when a district court instructs on involuntary manslaughter as a lesser included offense to voluntary manslaughter—as it was in this case—and the jury convicts the defendant of voluntary manslaughter, then any error in the involuntary manslaughter instruction is likely to be harmless. *Sola-Morales v. State*, 300 Kan. 875, 885-86, 335 P.3d 1162 (2014). Here, the jury found that the State presented overwhelming evidence in the record upon which a reasonable juror could conclude that Collins was guilty of voluntary manslaughter. Thus, even if there were error—which we do not believe—such error would be harmless.

20

We also do not find Collins' argument regarding the self-defense instruction given by the district court to be persuasive. Collins again concedes that he did not object to the district court's self-defense instruction at trial so we review this issue under a clearly erroneous standard. *Louis*, 305 Kan. at 457. Moreover, Collins does not challenge the factual appropriateness of the instruction given by the district court. Thus, the only issue is whether the instruction was legally appropriate.

As indicated above, the State asserts that Collins is barred from challenging the self-defense instruction on the ground of invited error. The invited error doctrine applies when a party not only fails to object at trial but also invites the alleged error by the district court. Invited error will be reviewed only if it is structural in nature. *State v. Logsdon*, 304 Kan. 3, 31, 371 P.3d 836 (2016). The mere fact that a defendant proposed the instruction he later complains of on appeal does not trigger the invited-error doctrine and there is no bright-line test for when the doctrine is triggered. *State v. Fleming*, 308 Kan. 689, 701, 423 P.3d 506 (2018).

In *Fleming*, the defendant submitted an aggravated robbery instruction consistent with the language in the pattern instructions. For the first time on appeal, the defendant argued that the district court should have given a more limited instruction relevant to the specific facts of his case or to the specific elements of the charging document. *Fleming*, 308 Kan. at 707. Our Supreme Court determined that the defendant could have avoided the problem by proposing an instruction with a "modification limiting the jury's consideration to the specific property alleged here." *Fleming*, 308 Kan. at 707. Thus, the defendant invited the alleged error.

Here, Collins submitted a request for the following jury instruction:

"The defendant raises self-defense as a defense to Count One. Evidence in support of this defense should be considered by you in determining whether the State has

21

met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant.

"Defendant is permitted to use physical force against another person, including using a weapon, when and to the extent that it appears to him and he reasonably believes such force is necessary to defend himself against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

"When use of force is permitted as self-defense, there is no requirement to retreat."

This proposed instruction is based on PIK Crim. 4th 51.050 and PIK Crim. 4th 52.200. The State proposed a similar language that instead focused on deadly force. The instruction ultimately given by the district court stated:

"The defendant raises self-defense as a defense to Count One. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant.

"Defendant is permitted to use physical force against another person, including using a weapon, when and to the extent that it appears to him and he reasonably believes such physical force is necessary to defend himself against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

"Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

"When use of force is permitted as self-defense, there is no requirement to retreat."

Nothing prevented Collins from asking the district court to add the language he now requests into the instruction. Moreover, Collins had notice that the Kansas Legislature amended K.S.A. 21-5108(c) in 2010. He could have incorporated the burden shifting language contained in the statute into his proposed instruction. However, he did not do so and instead chose to rely on the pattern instructions. Thus, we conclude that Collins had the opportunity to avoid the alleged error he invited by simply requesting a modification to the pattern instructions.

Regardless, we find that the instruction given was legally appropriate. As noted above, district courts are strongly encouraged to instruct juries using the pattern instructions. *Barber*, 302 Kan. at 377-78 ("We strongly recommend the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions."). Here, the district court instructed the jury in a manner that is consistent with PIK Crim. 4th 51.050 and PIK Crim. 4th 52.200.

We recognize that the 2010 Kansas Legislature amended K.S.A. 21-5108 (c) to add a requirement that, once a defendant produces evidence of an affirmative defense such as self-defense, the State must disprove "the defense beyond a reasonable doubt." L. 2010, ch. 136, § 8. As our Supreme Court has held, the 2010 amendment did not alter the law regarding the State's burden of proof nor did it create a new element that the State must prove when charging a crime. *State v. Staten*, 304 Kan. 957, 965-66, 377 P.3d 427 (2016). In this case, the district court instructed the jury that the State must prove every element of the crime beyond a reasonable doubt and that the affirmative defense does not alter the State's burden. In light of the instructions viewed as a whole, we do not find the jury instruction on self-defense that was given by the district court to be legally inappropriate.

23

We also do not find that self-defense instruction given by the district court to be clearly erroneous. Once again, Collins merely speculates how the inclusion of a jury instruction incorporating a more detailed explanation of the burden of proof may have impacted the outcome of his trial. We do not find that such speculation is sufficient to overcome Collins' burden on appeal. A review of the record reflects that the jury heard evidence of Collins' claim of self-defense, that the district court instructed the jury regarding the law of self-defense, and that it was instructed regarding the State's burden to prove each element beyond a reasonable doubt. As such, we conclude that the jury instructions—when viewed in their entirety—were not clearly erroneous.

*Prosecutorial Error*

Collins also contends that the State committed prosecutorial error by misstating the law during closing arguments. Specifically, Collins takes issue with the prosecutor's comments regarding the order in which the jury should consider the charges and lesser included offenses. The State responds that the comments were consistent with Kansas law as well as with the jury instructions. The State further points out that the prosecutor's statements regarding the order in which the jury should consider that charges and lesser included offenses were consistent with the statements made by Collins' attorney during closing arguments.

In *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), our Supreme Court found that reviewing claims of prosecutorial error involves a two-step process:

> "These two steps can and should be simply described as *error* and *prejudice*. To determine whether prosecutorial error has occurred, the appellate court must decide *whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.* If error is found, the appellate court must next determine *whether the error prejudiced the defendant's due*

24

*process rights to a fair trial.* In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 23-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, *prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record*, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" (Emphases added.)

Collins initially takes issue with a statement the State made during the initial portion of closing arguments. Specifically, the prosecutor said:

"The order in which you are to evaluate this case is that you are first to look at the second-degree murder intentional. If you do not agree on that first (sic) degree intentional, you are then, second, to move on to voluntary manslaughter. If you do not agree there, you are, third, to go on to the involuntary manslaughter."

Collins further takes issue with the following argument made by the prosecutor during the State's rebuttal:

"But again, you don't get down to this level unless you first start to buy off on the fact that he didn't want Daniel dead in the first place and that he didn't make that choice and act on it accordingly.

. . . .

"But to the extent that you believe Daniel did anything unlawful and his actions in standing up and calling the defendant a name, then you have to decide what response is appropriate. If you believe that some act of self-defense would have been justified against that, but the defendant just took a step too far, then, you know, that's your prerogative and

25

that's your choice, involuntary manslaughter. But again, you have to work your way down to that. You don't start there.

"You start with what the State has alleged, which is [an] intentional act."

We do not find the statements made by either the prosecutor or Collins' attorney during closing arguments to be erroneous. Both attorneys were arguing consistently with the jury instructions—specifically Instruction Nos. 6 and 7—and with PIK Crim. 4th 54.170 and 54.180. While Collins cites to *State v. Korbel*, 231 Kan. 657, 661, 647 P.2d 1301 (1982) in his brief, it was not a case that focused on the issue presented in this case. Here, we find that the statements made by the prosecutor were consistent with the law and were well within the wide latitude provided to prosecutors during closing arguments.

Even if the statements made by the prosecutor during closing arguments were considered to be erroneous, we do not find them to be prejudicial. As the State correctly points out, the instructions given by the district court indicate that the jury should first consider second-degree murder and then, "[i]f you do not agree that the defendant is guilty of murder in the second degree, you should then consider the lesser included offense of voluntary manslaughter." Instruction No. 6. Likewise, the instruction for involuntary manslaughter begins with, "[i]f you do not agree that the defendant is guilty of voluntary manslaughter . . . ." Instruction No. 7. As indicated above, these instructions are consistent with P.I.K. Crim. 4th 54.170 and 54.180 and are not coercive. Rather, they provide an orderly procedure for the jury to follow during deliberations. Thus, we conclude that the prosecutor did not err during closing arguments nor do we find that Collins suffered prejudice as a result of the comments he claims were erroneous.

*Cumulative Error*

Finally, Collins contends that he was denied a fair trial due to cumulative errors. When deciding if cumulative errors necessitate a new trial, the test is whether the totality

26

of the circumstances establishes that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. We examine any error in the context of the entire record, considering how the district judge dealt with each error as it arose. We also look at the nature and number of errors and their interrelationship, if any, as well as the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). We note that a single error cannot constitute cumulative error. *State v. Solis*, 305 Kan. 55, 71, 378 P.3d 532 (2016).

Based on our review of the record in this case, we do not find that Collins has shown any error, let alone reversible error. Moreover, even if we had found one or more errors, we do not find that Collins was denied the right to a fair trial. Based on our review of the record on appeal, we conclude that the district judge appropriately instructed the jury on the law and that the jury thoughtfully considered the evidence before reaching its verdict. This conclusion is highlighted by the fact that the jury chose not to convict Collins of second-degree murder but instead convicted him of the lesser included charge of voluntary manslaughter in addition to the weapons charge—from which he did not appeal.

Affirmed.